# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| PAUL DORSA, | ) | |
| | ) | |
|     Plaintiff, | ) | NO. 3:13-cv-01025 |
| | ) | |
| v. | ) | JUDGE CAMPBELL |
| | ) | MAGISTRATE JUDGE FRENSLEY |
| MIRACA LIFE SCIENCES, INC., | ) | |
| | ) | |
|     Defendant. | ) | |

## <u>MEMORANDUM</u>

Relator Paul Dorsa brought this action on behalf of himself and in the name of the United States of America alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* by Defendant Miraca Life Sciences, Inc. ("Miraca"). The claims in this matter have been resolved by settlement, except for Dorsa's claim that he was fired in retaliation for efforts to stop activity that he believed was in violation of the FCA. (*See* Doc. Nos. 59, 87).

Now before the Court is Miraca's motion for summary judgment on the retaliation claim, which is fully briefed. (Doc. Nos. 190, 191, 200, 202). In support of the motion, Miraca filed a Statement of Undisputed Material Facts (Doc. No. 192), to which Dorsa responded (Doc. Nos. 201).[1] Among the evidence Dorsa put forth in response to Miraca's motion for summary judgment is the Expert Report of Lorene Schaefer, Esq. (Doc. No. 199-11), which Miraca has moved to exclude (Doc. No. 206). Dorsa also filed two notices of supplemental authority (Doc. Nos. 221, 227).

---

[1]     For ease of reference, Miraca's Statement of Undisputed Material Facts (Doc. No. 192), together with Dorsa's Response (Doc. No. 201) is cited as "Miraca SUMF ¶__."

Also before the Court is Dorsa's Motion for Review of Non-Dispositive Order of Magistrate Judge seeking review of the Magistrate Judge's privilege rulings. (Doc. No. 215). An Order on the Motion for Review has been entered separately. For the reasons explained in that Order, the Court concludes Miraca has waived privilege as to certain documents. However, because these documents do not affect the ultimate disposition of the motion for summary judgment, the Court need not delay decision on the instant motion.

For the reasons stated herein, Miraca's motion for summary judgment (Doc. No. 190) will be denied and Miraca's Motion to Exclude Lorene Schaefer's Expert Report and Testimony (Doc. No. 206) will be denied as moot.

## I.    BACKGROUND

During the relevant time period, Miraca was a diagnostics services company that provided "pathology services" in various healthcare specialties. Paul Dorsa began working for Miraca in July or August 2012 as Senior Vice President of Commercial Operations. (Miraca SUMF ¶ 7). Dorsa was in charge of Miraca's sales team. (*Id.* ¶ 8). Dr. Frank Basile was Miraca's Chief Executive Officer, Russell Farr was General Counsel, and John Rasmussen was Assistant General Counsel and Chief Compliance Officer.[2] (*Id.* ¶¶ 4-6).

At the time, a "safe-harbor" to the Anti-Kickback Statute allowed companies to make donations to physicians to implement electronic health records in physicians' offices. 42 C.F.R. § 1001.952(y) to the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)). The safe-harbor was subject

---

[2]     The parties rely extensively on the deposition testimony of Dorsa, Basile, Rasmussen, and Farr. For ease of reference these depositions are cited as "Dorsa Dep.," "Basile Dep.," "Rasmussen Dep.," and "Farr Dep." Their depositions are filed in the record as follows: Dorsa Dep. (Doc. Nos 193, Ex.6, and 199-2); Basile Dep. (Doc. Nos. 193, Ex. 1, and 199-5); Rasmussen Dep. (Doc. No. 193, Ex. 2, and 199-8); Farr Dep. (Doc. No. 193, Ex. 3, and 199-3).

to limitations on the value of the donation and required that the physician receiving the donation could not make the donation a "condition of doing business with the donor," and the donor could not "directly take into account the volume or value of referrals … generated between the parties in determining whether to donate or the amount of the donation." 42 C.F.R. § 1001.952(y)(4)-(6) (2013); 42 C.F.R. § 411.357(w)(5)-(7) (2013). Miraca had a process to approve donations that required Dorsa, Basile, and others to execute a form authorizing the donation (the "Donation Form"). (Miraca SUMF ¶ 13).

Dorsa came to believe that Miraca's donations did not fall within the safe-harbor and, therefore, violated the Anti-Kickback Statute. (Dorsa Dep. at 112, 127, 147; Dorsa Decl., Doc. No. 199-4 at ¶ 7). Dorsa never sent these concerns in writing to Miraca, but he claims to have shared them with Basile, Farr, and Rasmussen from September 2012 through August 2013.[3] (Dorsa Dep. at 120, 125, 210-211, 299-303). Dorsa testified that he had a standing weekly meeting with Basile and that he raised these concerns with Basile on numerous other occasions. (*Id*. at 207). Although he could not recall the specific dates of these other conversations, Dorsa testified that he told Basile that "our practice was different than our policy and different than the agreement that Mintz had put together … And that it was a violation of the False Claims Act and that we were going to have issues." (*Id*. at 210-11). Dorsa said he also reported to Basile that an analyst told Dorsa that "he's got file boxes filled with files that will put us in jail." (*Id*. at 211). Dorsa says after he reported this to Basile, Basile told Rasmussen and the boxes were shipped to Phoenix. (*Id*.). Plaintiff stated that he does not remember with specificity each and every conversation he had with Basile and Farr

---

[3] Dorsa said he did not submit anything about his concerns in writing because he worked with "these gentlemen" everyday and "to put it in writing would have implied that I was setting up for a lawsuit." (Dorsa Dep., Doc. No. 199-2 at 197). Dorsa said that he was focused on trying to correct the problem and that it "was never [his] intention to file the qui tam." (*Id*.).

about the EMR donation program during this time period or the precise words he used during those conversations, but he generally recalls "making it clear to Mr. Basile and Mr. Farr that making donations to induce referrals violated the Anti-Kickback Statute, tainted the referrals Miraca received, and resulted in fraud on the Government, which was obvious to Plaintiff and others at Miraca given the company's substantial volume of Medicare business." (Pl. Response to Interrogatory No. 3, Doc. No. 193-1 at PageID# 2361). Dorsa also stated that he had separate conversations with Basile and Farr regarding a letter Miraca received in July 2013 from a law firm representing Rahway Pathology, which alleged that Miraca had violated various state and federal laws by offering EMR donations to obtain referrals. (*Id.* at PageID# 2362). Referring to the contents of the letter, Dorsa told Basile and Farr, "this is what I've been saying is the problem." (*Id.*).

In June and July 2013, at the direction of his attorneys, Dorsa drafted multiple versions of a letter to Farr, but he never sent a letter to Miraca. (Miraca SUMF ¶ 34 (citing Plaintiff's Privilege Log and Dorsa Dep. at 230-35)). Dorsa testified he did not feel a "sense of urgency" to send the letter because he "constantly talked with him about what was in – what was in the letter." (Dorsa Dep. at 233-34). In August 2013, Dorsa decided he would no longer sign the Donation Forms. (*Id.* at 15, 99, 141, 197, 208, 235-36). He told Basile that he would not sign the Donation Forms because of "the compliance problem of fraud and abuse," "anti-kickback" violations, and "False Claims Act" violations associated with the company's donation program. (Dorsa Dep. at 208 ("[I]t was absolutely clear to me that they weren't going to try to correct the problem of – the compliance problem of fraud and abuse, anti-kickback around the False Claims Act. And I told them that. And I told him I would not be signing any of the safe harbor donations forms again."). By September

4

5, 2013, Dorsa had decided to file a qui tam FCA action against Miraca. (Miraca SUMF ¶ 52 (citing Dorsa Dep. at 235)).

Dorsa testified he and Frank Basile had a conversation about Dorsa's refusal to sign the Donations Forms on September 9, 2013. (*Id*. at 110). When Basile told Dorsa to resume signing the Donation Forms, Dorsa said, "Frank, I've been saying since early on that I'm concerned that this is a scheme to defraud the government through an anti-kickback in the Medicare program, you've been assuring me that it's not, that we're doing everything right." (*Id*. at 110). Basile responded, "Paul, we're already pregnant. And if the government investigates, we'll just settle." (*Id*.). Dorsa and Basile spoke again the next day. (*Id*. at 204). Basile told Dorsa that he either needed to resume signing the forms or call the compliance hotline. (*Id*. at 203).

Basile, Rasmussen, and Farr each testified that they did not recall Plaintiff raising any complaints regarding Miraca's EMR donation or meaningful use programs during this time. (Basile Dep. at 85-86; Farr Dep. at 103-104; Rasmussen Dep. at 147-48, 159, 162-63).

On September 16, 2013, Dorsa called the anonymous compliance hotline because "Frank [Basile] told me to." (Dorsa Dep. at 203). The compliance hotline transmitted a report of Dorsa's anonymous call to Farr and Rasmussen, which paraphrased what Dorsa stated during the call. (*See* Dorsa Dep., Ex. 15). The summary stated that the "nature of the violation of policy" was "Kickbacks/Non-Compliance issues" specifically:

> The Caller has recently observed that the Miraca Electronic Health Records Donation Program may not be in compliance with the Safe Harbor Provisions of federal law. Specifically, the Caller said Miraca is making donations to physicians in order to induce referrals, and the donations are made with the intent that the physicians will create referrals. Also, the Caller said Miraca representatives may be conditioning donations on physicians in becoming or remaining clients of Miraca. Furthermore, the Caller said that Miraca may be providing meaningful use of consultations to physicians without signing consultation agreements or requiring payments.

5

(*Id.*).

Rasmussen did not know for sure that the complaint was from Dorsa, but he suspected it was. (Miraca SUMF ¶ 38). Later that day, Basile emailed a draft termination letter to Miraca's in-house counsel. (Miraca Privilege Log, Doc. No. 199-7 (describing the email as "containing draft termination letter for Paul Dorsa and discussing unsigned electronic health records donation forms.")).[4]

On August 28, 2013, around the same time as Dorsa stopped signing the Donations Forms, Miraca began an investigation into reports that Dorsa had engaged in "conduct that could be considered sexual harassment." (Rasmussen Investigation Report, Doc. No. 195-2). Rasmussen, who was Assistant General Counsel and Chief Compliance Officer, received a phone call on August 28, 2013, from Tom Zaves and spoke to Zaves again on September 4, 2013.[5] Zaves reported that that Paul Dorsa referred to a male co-worker as K.C.'s "boyfriend" on more than one occasion. (*Id.*). Zaves reported that K.C. was "freaked out," but that she said this comment was a "2" on a scale of 1 to 10 and Dorsa had been "in the 8 or 9 range." (*Id.*). Zaves said another employee, Zach Jeffrey, had information. (*Id.*). Rasmussen spoke to Jeffrey on September 5, 2013. (*Id.*). Jeffrey confirmed the "boyfriend" comment and added that Dorsa had "grabbed" a broken

---

[4]     Miraca has asserted attorney-client privilege over the September 16, 2013 email from Basile to Rasmussen, but has filed its Privilege Log as evidence in support of its motion for summary judgment. (*See* Miraca Privilege Log, Doc. No. 193, Ex. 28). Plaintiff argues that Miraca's reliance on the September 16, 2013 email results in a waiver of attorney-client privilege. The Court considered waiver of privilege as to this and other documents in its Order on Plaintiff's Motion for Review of Non-Dispositive Order of Magistrate Judge, which has been entered separately. For the reasons explained in that Order, the Court agrees Miraca has waived privilege as to the September 16, 2013 email. The content of these documents, while relevant to the case, does not affect the ultimate disposition of the motion for summary judgment. Accordingly, the Court need not delay decision on the instant motion.

[5]     It is not clear from the Report what information Tom Zaves provided in the initial phone call on August 28, 2013, and what information was provided during the follow-up call on September 4, 2013.

cell phone from K.C.'s lap, causing her to exclaim, "Did you see that? What the hell? I think he grazed my thigh." (*Id*.). Jeffrey also reported that he had heard Dorsa call K.C. a bitch, and that K.C. told him Dorsa made other suggestive comments. (*Id*.). Rasmussen interviewed five additional employees between September 6 and September 13, 2013.[6] (*Id*.). One of these employees, L.K., reported that K.C. felt she was being "used politically to get rid of Paul," that K.C. was surprised Rasmussen wanted to talk to her, and that K.C. did not think the "boyfriend" comment was "that big of a deal." (*Id*.). More than one employee reported that Dorsa said inappropriate things and one described him as a "creepy kinda guy," but also that she considered it "fatherly/brotherly type of banter." (*Id*.). Another thought both Dorsa and K.C. said "things they shouldn't." (*Id*).

Rasmussen spoke with Dorsa about the allegations on September 18, 2013. (*Id*.). Dorsa claims this was the first he had heard of the sexual harassment investigation.[7] (Dorsa Dep. at 252, 254-55). Thinking that Miraca had "concocted the whole scheme" as a way to "handle" his compliance complaint, Dorsa told Rasmussen, "[S]o this is how you are going to handle it?" (Dorsa

---

[6]     The report does not indicate when A.S. was interviewed. Because the interviews are listed in chronological order, the Court assumes she was interviewed during this period.

[7]     Miraca contends Dorsa knew about the sexual harassment investigation before his interview on September 18, 2013. Miraca points to Dorsa's claim that in early September 2013 and again on September 16 or 17, 2013, P.R. told him that the "company was coming for him." (Pl. Response to Interrogatories, Doc. No. 193-1 at PageID# 2364-65). Dorsa believes P.R. was warning him that the company was "coming for him" because he raised concerns about Miraca's allegedly illegal practices. (*Id*.).

        As additional evidence that Dorsa knew about the investigation, Miraca cites a portion of the Investigation Summary in which Rasmussen reported that on September 6, 2013, Z.J. told Rasmussen that "[K.C.] said she told [H.S.] about this, [H.S.] told [G.R.] and [D.R.], and one of them told Paul [Dorsa]." (*See* Investigation Summary, Doc. No. 195-2). Dorsa objects to any conclusions extracted from multiple levels of hearsay and argues that it is not even clear what "this" is referring to. (Pl. Resp. to Miraca SUMF ¶ 51).

7

Dep. at 252-256). According to the Investigation Report, Dorsa denied that he had grabbed a broken cell phone from between K.C.'s legs, denied that he ever called K.C. a "bitch," and denied that he told K.C. that she was "not supposed to" tell Rasmussen that he said "inappropriate things." (Rasmussen Investigation Report, Doc. No. 195-2). After speaking with Dorsa, Rasmussen revised the Investigation Report and emailed it to outside employment counsel with instructions to "[w]rap it up." (Sept. 18, 2013 Email, Doc. No. 193-1 at PageID# 2430).

Rasmussen provided a copy of the Investigation Report to Basile on or around September 23, 2013. (Miraca SUMF ¶ 53). The next day, September 24, 2013, Dorsa was terminated "for cause" for violating "the Company's policy against workplace harassment on several occasions and thereafter showing a complete lack of candor in response to Miraca's inquiries" about his alleged conduct. The letter stated:

> Following a reasonable investigation, Miraca has concluded that you violated the Company's policy against workplace harassment on several occasions and thereafter showed a complete lack of candor in response to Miraca's inquiries directed to you relating to your workplace behavior. Your conduct in this respect represents an abject lack of loyalty and breach of your fiduciary responsibilities as a Senior Vice President to not only comply with but enforce significant workplace policies including the Company's workplace harassment policy. Your conduct in this matter is unacceptable and is conclusive grounds for termination of your employment for Cause on an immediate basis.

(Termination Letter, Doc. No. 199-5 at PageID# 2772). During his deposition, Basile testified that "we terminated him because of the sexual harassment thing. There were – there were potentially questions around his performance and there was also a comment around, you know, the process for these donation forms that, again, I wasn't really sure why [] we were hung up." (Basile Dep. at 122-23). Basile testified that he viewed the conduct described in the Investigation Summary as "a totality of behavior around certain aspects of workplace relationships … I looked at the whole

8

thing as totality, as a pattern ... Plus added to the other stuff, it felt like it was the best course."
(*Id.* at 102-03).

K.C. did not return Rasmussen's phone calls or emails until after Dorsa had been terminated on September 24, 2013. (*Id.*; *see also*, K.C. Decl., Doc. No. 195-1 at ¶ 15). She says that she did not report Dorsa's behavior because she did not want to "get involved" and that she did not return Rasmussen's requests to talk because she was afraid of retaliation by Dorsa. (*Id.* at ¶¶ 14-15). When she spoke to Rasmussen, she confirmed that Dorsa made the inappropriate comments reported by others and some additional comments. (Rasmussen Investigation Report, Doc. No. 195-2). She also confirmed the "broken phone event" and said that Dorsa's "thumb touched her thigh" and that she was "freaked out." (*Id.*). K.C. also reported that Dorsa had called her into his office the previous night, asked her about the sexual harassment allegations, and said "[T]hat's the wrong answer," when K.C. said that Dorsa had grabbed the cell phone and made the "bitch" and "boyfriend" comments. (*Id.*).

On September 20, 2013, before he was terminated, Dorsa initiated this action by filing the Complaint under seal. (Doc. No. 1). Miraca received a subpoena from the government requesting certain documents and information but did not learn of the Complaint until the case was partially unsealed approximately two years later. (Doc. No. 33; Miraca SUMF ¶¶ 21, 22). In November 2013, Dorsa amended the complaint to add a retaliation claim under 31 U.S.C. § 3730(h). On November 26, 2018, the Government elected to intervene in this case for purposes of settlement after more than four years of investigation. (Doc. No. 70). The parties settled the FCA causes of action in this case, and others, for $63.5 million without any admission of liability. The only claim remaining is Dorsa's retaliation claim.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's claims. *Id.*

In evaluating a motion for summary judgment, the Court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence from which the jury could reasonably find for the nonmoving party. *Rodgers* 344 F.3d at 595.

## III.    ANALYSIS

### A.    Legal Framework

The anti-retaliation section of the FCA protects employees who help expose frauds against the government. Section 3730(h) of the FCA provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h).

To establish a claim for retaliation under the FCA a plaintiff must show: "(1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *United States ex rel. Sheoran v. Wal-Mart Stores E.*, 858 F. App'x 876, 880 (6th Cir. 2021) (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003)).

Retaliation claims under the FCA are evaluated under the same framework applicable to other employment retaliation claims. *Jones-McNamara v. Holzer Health Systems*, 630 F. App'x 394, 397-98 (6th Cir. 2015). If a plaintiff presents direct evidence of retaliation, "the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Id.* at 398 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

If a plaintiff has circumstantial evidence of retaliation, the Court applies the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* Under *McDonnell-Douglas* framework, the plaintiff has the initial burden to establish

11

a prima facie case. *Id*. A prima facie case for retaliation under the FCA requires the plaintiff to show the three elements listed above. *Id*. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. *Id*. If such a reason is provided, the burden then shifts back to the plaintiff to demonstrate that the defendant's proffered non-discriminatory reason is a pretext for unlawful retaliation. *Id.*

### B.      Direct Evidence

Dorsa argues he has both direct and circumstantial evidence of discrimination. As direct evidence of discrimination, Dorsa points to Miraca's Privilege Log showing that Basile circulated a draft termination letter on September 16, 2013, hours after Dorsa called the compliance hotline. (Doc. No. 200 (citing Miraca's Privilege Log, Doc. No. 199-7)). The Privilege Log describes the email as "[c]ommunications with in-house counsel containing draft termination letter for Paul Dorsa and discussing unsigned electronic health records donation forms." Miraca responded that the email is not direct evidence of retaliation and argued that because "the letter is privileged," Dorsa's assumption about the contents of the email was nothing but a "self-serving guess." (Doc. No. 202 at 5). As discussed *supra*, note 4, the Court has concluded Miraca has waived privilege as to Basile's September 16, 2013 email.

Accordingly, the Court will not decide whether the Privilege Log description of the email is direct evidence of retaliation and will proceed to consider whether Dorsa has circumstantial evidence of discrimination sufficient to survive summary judgment. Miraca challenges Plaintiff's ability to establish any element of a prima facie case or to show pretext.

12

### C. Protected Activity and Notice

The FCA protects "lawful acts done by the employee … in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). Prior to 2009, Section 3730(h) protected an employee from retaliation only if they acted "in furtherance of an [FCA] action." And an employer was deemed to have notice only if it had "reason to believe a qui tam action was a 'distinct possibility' or was being 'contemplated.'" *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 517 (6th Cir. 2000); *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567-68 (6th Cir. 2003). And employees charged with investigating fraud as part of their ordinary job responsibilities were required to "make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." *Yuhasz*, 341 F.3d at 568 (quoting *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 n.7 (10th Cir. 1996)).

Following the 2009 amendment, the Sixth Circuit has held that "pre-amendment case law holding that activity is protected only if it is in furtherance of a potential or actual qui tam action is no longer applicable." *Miller v. Abbott Lab.*, 648 F. App'x 555, 560 (6th Cir. 2016) (citing *Jones McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 399 (6th Cir. 2015)). Nevertheless, in 2021, the Sixth Circuit, relying only on pre-amendment case law and without reference to the statutory language, affirmed dismissal of a plaintiff's FCA retaliation claim "because he failed to plead that [the defendant] knew he was pursuing an FCA action." *United States ex rel. Sheoran v. Wal-Mart Stores East LP*, 858 F. App'x 876, 880 (6th Cir. 2021) (citing *Yuhasz*, 341 F. 3d at 566). Defendant urges the Court to follow *Wal-Mart*, and the pre-amendment decisions *Yuhasz* and *McKenzie* and require Plaintiff to establish that Miraca had notice that he intended to bring or assist in an FCA action. (Doc. No. 191 at 21). None of these cases control the analysis here. This is because *Yuhasz*

13

and *McKenzie* predate the amended statute (*McKenzie*, 219 F.3d 508; *Yuhasz*, 341 F.3d 559); and *Wal-Mart*, though more recent, did not consider the expanded scope of protected activity under Section 3730(h).[8] *Wal-Mart*, 858 F. App'x at 880.

Internal reports may constitute protected conduct. *Jones-McNamara*, 630 F. App'x at 399. For an employer to have notice that a plaintiff is trying to stop an FCA violation, "an employee must show some linkage between the activities they complain of and fraud on the government." *United States v. Complete Fitness Rehabilitation, Inc.*, 721 F. App'x 451, 461 (6th Cir. 2018). The plaintiff is not required to use magic words, it is sufficient if the employer would have understood the complaints to implicate fraud on the government. *Id.*

Dorsa claims his repeated statements to Basile, Rasmussen, and Farr were protected activity and were sufficient to put Miraca on notice that he believed Miraca was defrauding the government, which was an effort to "stop 1 or more violations." Dorsa also points to his decision to stop signing the Donation Forms and his complaint to the hotline regarding his concerns that Miraca was not in compliance with the Safe Harbor and was making donations to induce referrals.

Miraca contends Dorsa's "concerns" were too vague to qualify as protected conduct or to put Miraca on notice that his complaints were in furtherance of an FCA action or were efforts to stop an FCA violation. Miraca also takes issue with the fact that, for the most part, Dorsa does not remember the specific dates of or words used when he raised his concerns with Basile, Rasmussen, and Farr, and he never submitted his concerns in writing. Even if his refusal to sign Donation Forms did qualify as protected conduct, Miraca argues it did not have notice that the refusal to sign

---

[8]    In *Wal-Mart*, the Sixth Circuit relied only upon *Yuhasz*, 341 F. 3d at 566, and *McKenzie*, 219 F.3d 508, likely because the Plaintiff had only argued that he had engaged in protected conduct under the first prong of Section 3730(h) and that he met the standard articulated in *Yuhasz*. *See* Brief of Appellant Ashwani Sheoran, *Wal-Mart*, 858 F. App'x 876, 880 (6th Cir. 2021) (No. 20-2128), Docket Entry 21 at 12-14.

14

the Donations Forms was an effort to stop an FCA violation. Miraca points to Basile's contemporaneous email stating that Dorsa "was not able to be specific about his concerns." (Doc. No. 191 at 20 (citing Sept. 13, 2013 Email from Basile, Doc. No. 193-1 at PageID# 2405)).[9]

The determination of whether certain of Dorsa's activities were protected activity for purposes of Section 3730(h) is rife with material factual disputes. First, did Dorsa's job responsibilities include a compliance function? If so, perhaps some of his statements could be viewed as merely "urging compliance" and therefore doing his job rather than an effort to stop an FCA violation. Dorsa testified that he viewed "compliance as an important part of [his] responsibilities," but argues these compliance responsibilities were no more than those borne by every member of the company, his Employment Agreement did not assign him any compliance-related responsibilities, and compliance was the responsibility of the Chief Compliance Officer, John Rasmussen. (Dorsa Dep. at 139-41; Basile Dep. at 135-36; Dorsa Employment Agreement at § 1.2, Doc. No. 199-1).

Most importantly, there is a dispute regarding whether Dorsa raised compliance concerns at all, and if so, what he said. Dorsa does not dispute that he did not notify Miraca of his concerns in writing, but Miraca does not point to any authority stating that written notice is required. To be sure, written notice would obviate questions regarding what exactly was said, but Dorsa's testimony that he repeatedly advised Basile, Rassmussen, and Farr that the donation program "was

---

[9] Miraca claims the majority of this email is subject to attorney-client privilege. Although it has produced the quoted portion, the remainder of the email has been redacted. (*See* Miraca Privilege Log, Doc. No. 193, Ex. 28). Dorsa argues Miraca's selective disclosure of the quoted portion waives asserted attorney-client privilege over the entire email. As explained *supra* at note 4, the Court considered waiver of privilege as to this and other documents in its Order on Plaintiff's Motion for Review of Non-Dispositive Order of Magistrate Judge, which has been entered separately. For the reasons explained in that Order, the Court agrees Miraca has waived privilege as to the September 13, 2013 email in its entirety. The content of this email does not affect the ultimate disposition of the motion for summary judgment. Accordingly, the Court need not delay decision on the instant motion.

15

a violation of the False Claims Act and that we were going to have issues," constitutes protected activity. (Dorsa Dep., Doc. No. 199-2 at 210-11). Even if Basile, Rasmussen, and Farr have no recollection of Dorsa raising such concerns, Dorsa's testimony creates a question of fact on this issue.[10]

Likewise, although Basile denies that he knew why Dorsa stopped signing the forms, Dorsa points to his own testimony that he told Basile that he would not sign the Donation Forms because of "the compliance problem of fraud and abuse," "anti-kickback" violations, and "False Claims Act" violations associated with the company's donation program. (Dorsa Dep. at 208). Finally, with regard to the hotline call on September 16, 2013, although the call was officially anonymous, Farr suspected the call was from Dorsa and communicated his suspicion to Rasmussen. (*See* Sept. 16, 2013 Email from Farr to Rasmussen, Doc. No. 193-1 at PageID# 2398; Rasmussen Dep. at 136-37). Viewing these facts in the light most favorable to Dorsa, a reasonable jury could conclude that Miraca knew Dorsa was raising concerns about fraud on the government.

---

[10]     Defendant argues that "the Court should not credit Plaintiff's self-serving testimony where it is unsupported by additional evidence." (Doc. No. 202 at 2 (citing *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020)). Defendant quotes *Davis*, which is a published Sixth Circuit decision, as stating that "the Court views self-serving testimony opposing a motion for summary judgment with scrutiny when it is unsupported by additional evidence." *Davis* contains no such statement and in fact says the opposite: "Although perhaps not as strong as some other evidence might be, self-serving statements can create a genuine dispute of material fact to be resolved at trial." 951 F.3d at 750. The *Davis* court acknowledged that sometimes self-serving statements might not be sufficient to survive summary judgment, for example when the testimony is "blatantly and demonstrably false," but that was not the circumstance in *Davis* and it is not the circumstance here. The Court has no cause to disregard Plaintiff's statements even if other witnesses have a different recollection of the same events.

Defendant did not create the quote attributed to *Davis* out of whole cloth. Several district court decisions include this language, which appears to have originated in *Johnson v. Buddy's Bar B Que*, 2015 WL 1954454, at *4 (E.D. Tenn. Apr. 29, 2015). Notably, in *Johnson*, the "self-serving testimony" at issue was not merely unsupported by additional evidence, it was blatantly contradicted by the attestant's own prior signed statements. *Id*. at *5. The Court held that the plaintiff could not defeat summary judgment with an affidavit that contradicts prior signed statements. *Id*.

16

### D. Causation

To satisfy the third element of a prima facie claim for retaliation, Dorsa must show that Miraca "discharged or otherwise discriminated against [him] as a result of the protected activity." *Wal-Mart*, 858 F. App'x at 880. Section 3730(h) provides a cause of action to any employee who is terminated "because of" the employee's lawful acts in furtherance of an FCA action or to stop one or more FCA violations. 31 U.S.C. § 3730(h). "Although the Sixth Circuit has not expressly addressed the applicable standard in the FCA context the language of the statute dictates the conclusion that it is the same standard as that applied in the Title VII context, which 'require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action.'" *United States ex rel. Seabury v. Cookeville Regional Med. Ctr. Auth.*, No. 2:15-cv-00065, 2021 WL 4594784, at * 15 (M.D. Tenn. Oct. 6, 2021) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). "In other words, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not ... engaged in protected activity." *Id.* (quoting *George v. Youngstown State Univ.*, 966 F.3d 446, 459–60 (6th Cir. 2020)). "This burden is 'not onerous' and, at the prima facie stage, 'can be met through evidence that ... the adverse action was taken shortly after the plaintiff's exercise of protected rights.'" *Id.* Temporal proximity is evidence of a causal connection. *Id.*

Miraca argues Dorsa must show that "the protected activity was *the* reason he was terminated, and not simply *one of the reasons*." (Doc. No. 191 at 22). Miraca argues that there is no evidence that it "would not have fired Plaintiff for sexual harassment but for Plaintiff's purported internal complaints." (*Id.* at 24).

In response, Dorsa points to the temporal proximity between his call to the compliance hotline and Basile's circulation of a draft termination letter hours later. Even if Basile did not know

of the hotline complaint when he circulated the termination letter on September 16, 2013, Dorsa has provided evidence that Basile was aware of other protected activity – refusal to sign the Donation Forms. In fact, Basile testified that the "comment around [] the process for these donations forms" was part of the basis for the termination decision. (Basile Dep. at 122-23) (discussing the reasons for termination). This protected activity, particularly when it occurred in the final weeks before Dorsa's termination, is sufficient to establish a prima facie claim as to causation. *See Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 664–65 (6th Cir. 2020) (lapse of two months was sufficient to show a causal connection based on temporal proximity), *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (lapse of three months was sufficient to show a causal connection based on temporal proximity). Moreover, although Dorsa's earlier complaints occurred several months before his termination, Dorsa argues that the effect of his complaints was cumulative and may also have played into the termination decision. *See Seabury*, 2021 WL 4594784, at *18.

Dorsa also argues the decision to "ramp up" the sexual harassment investigation after his confrontations with Basile on September 9 and 10, 2013, is evidence of causation. Because the Court finds that Dorsa has met his burden to show causation based on temporal proximity, the Court need not consider whether the timing of the investigation establishes a separate basis for causation.

### E.     Pretext

Having established a prima facie claim of retaliation, the burden then shifts to Miraca to show that Dorsa would have bene terminated even if he had not engaged in the protected activity. Miraca's proffered non-retaliatory reason for terminating Dorsa is that Dorsa engaged in harassing workplace behavior as determined by Rasmussen's investigation. (Doc. No. 191 at 24). The burden

18

then shifts back to Dorsa to "articulate some cognizable explanation of how the evidence [he] has put forth establishes" that the proffered reason is pretext for retaliation. *Seabury*, 2021 WL 4594784, at * 19 (citing *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020)). Pretext can be shown by evidence that the proffered reason was factually false, did not actually motivate discharge, or was insufficient to motivate discharge. *Id*. "But these are not the only ways that a plaintiff can establish pretext; these three categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?" *Id*. (quoting *Miles*, 946 F.3d at 888) (internal quotation marks and citations omitted). "Notably, while temporal proximity in retaliation cases 'cannot be the sole basis for finding pretext,' it can be 'a strong indicator of pretext when accompanied by some other, independent evidence.'" *Id*. (citing *Briggs v. Univ. of Cincinnati*, 11 F.4th 498 (6th Cir. 2021)).

Dorsa argues there is "abundant evidence of pretext" and focuses on three areas: (1) Miraca's reasons for termination have shifted over time; (2) there is no proof Basile had seen the investigation report or discussed the investigation with counsel when he decided to terminate Dorsa; and (3) the investigation did not provide a reasonable basis to conclude Dorsa violated Miraca's harassment policy. First, Dorsa points to evidence that Miraca's reasons for termination have shifted from what was described in the termination letter – "workplace harassment" and "lack of candor" – to add three additional reasons: (1) "rumors" and "gossip" about Dorsa's behavior at a national sales meeting; (2) "questions around his performance;" and (3) the "hang up" regarding the donation forms. (Doc. No. 200 at 21 (citing Basile Dep. at 18-19, 44-45, 47-48, 51, 54-56, 122-123; and Miraca's Second Am. & Supp. Resp. to Interrog. 3, Doc. No. 199-14 at PageID# 2937-38)). These shifting reasons for termination, coupled with temporal proximity between the protected conduct and adverse employment action are sufficient to raise a question of fact as to

19

pretext. *See Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579 (6th Cir. 2002) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.") (quoting *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996)); *Hixon v. TVA Bd. of Dir.*, 504 F. Supp. 3d 851, 873 (E.D. Tenn. 2020) (adding reasons for an adverse employment action is evidence of pretext).

Dorsa also points to an absence of evidence that Basile had seen Rasmussen's investigation summary or spoken with outside counsel before he decided to terminate Dorsa's employment. None of Miraca's witnesses could specify when Basile was informed of the investigation or provided with a copy of the report, (*see* Rasmussen Dep. at 110-11, 141, 143, 187-88, 216; Basile Dep. at 43, 129-30; Farr Dep. at 24-26); and the earliest email showing that Basile had notice of the harassment investigation is from September 17, 2013, the day after Basile sent a draft termination letter to Rasmussen for review (*see* Miraca's Aug. 2023 Privilege Log, Doc. No. 199-7). A jury could find Miraca's claim that the termination decision was based on the harassing workplace behavior as detailed in Rasmussen's report was pretext for discrimination when there is no evidence that Basile had seen the report or spoken with outside counsel before the termination decision was made. *See Burton v. Freescale Semiconductor*, 798 F.3d 222, 240 (5th Cir. 2015) (finding lack of documentation can be probative of pretext).

Finally, Dorsa argues that it was unreasonable for Miraca to rely on the investigation summary as grounds for termination because the investigation was inadequate. (Doc. No. 200 at 22). Dorsa points to Miraca's failure to interview K.C. before concluding that he had violated workplace policies and the failure to resolve "gaps and conflicts" in the accounts of other witnesses. (*Id*. at 23). Dorsa also argues that the conduct described in the investigation report does not constitute sexual harassment as defined in Miraca's Code of Conduct. (*Id*.). In support of his

20

argument that the investigation was inadequate, Dorsa has submitted the Expert Report of Lorene Schaefer, Esq., which sets forth seven ways the investigation deviated from accepted standards for workplace investigations. (Schaefer Expert Report, Doc. No. 199-11). Miraca filed a Motion to Exclude Lorene Shaefer's Expert Report and Testimony. (Doc. No. 206).

Because Dorsa has provided sufficient evidence of pretext to raise a question of fact as to whether Dorsa was terminated for Miraca's stated reasons or in retaliation for protected conduct, the Court need not consider whether the sufficiency of the investigation alone would establish pretext. For the same reason, the Court does not rely upon the expert report prepared by Lorene Schaefer, Esq. (Doc. No. 199-11). Defendant's motion to exclude the expert report (Doc. No. 206) is therefore **MOOT**. At this juncture, the Court makes no determinations about the admissibility of Ms. Shaefer's testimony at trial.

## IV.    CONCLUSION

For the reasons stated, Miraca's Motion for Summary Judgment (Doc. No. 190) will be **DENIED**, and Miraca's Motion to Exclude Lorene Schaeffer's Expert Report (Doc. No. 206) will be **DENIED AS MOOT**.  An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE