# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA, ex rel. PAUL DORSA, Plaintiff,

v.

MIRACA LIFE SCIENCES, INC., Defendant.

) Civil Case No. 3:13-cv-01025
) Judge Campbell
) Magistrate Judge Frensley

VIDEO RECORDED ZOOM DEPOSITION OF

CHRISTOPHER B. ROBINSON, CPA

TAKEN ON BEHALF OF THE PLAINTIFF

OCTOBER 31, 2024



I N D E X


| | PAGE |
|---|---|
| EXAMINATIONS | |
| Direct Examination by Mr. Sanders | 7 |
| EXHIBITS | |
| (PLAINTIFF'S) | |
| Exhibit 1 Initial Report | 27 |
| Exhibit 2 Supplemental Report | 28 |
| Exhibit 3 The Comprehensive Guide to Economic Damages Excerpt | 59 |
| Exhibit 4 Measuring Damages Involving Individuals Excerpt | 68 |
| Exhibit 5 Press Release | 85 |
| Exhibit 6 Miraca 1938 | 85 |
| Exhibit 7 Dorsa's Employment Agreement | 97 |
| Exhibit 8 Zaves Employment Agreement | 104 |
| Exhibit 9 Litigation Services Handbook Excerpt | 123 |
| Exhibit 10 Steve McMindes Documents | 132 |
| (EXHIBITS ATTACHED) | |




IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA, ex rel. PAUL DORSA , Plaintiff,

v.

MIRACA LIFE SCIENCES, INC., Defendant.

) Civil Case No. 3:13-cv-01025
) Judge Campbell
) Magistrate Judge Frensley

VIDEO RECORDED ZOOM DEPOSITION OF CHRISTOPHER B. ROBINSON, CPA, produced, sworn and examined on October 31, 2024, between the hours of eight o'clock in the forenoon and five o'clock in the afternoon of that day, in Boston, Massachusetts, appearing remotely before Ashley C. Huelsmann, Registered Professional Reporter, Certified Shorthand Reporter (IL) and Certified Court Reporter (MO), in a certain cause now pending in the United States District Court, Middle District of Tennessee, Nashville Division, between UNITED STATES OF AMERICA, ex rel. PAUL DORSA, Plaintiff, vs. MIRACA LIFE SCIENCES, INC., Defendant; on behalf of the Plaintiff.



A P P E A R A N C E S
(ALL PARTIES APPEARING REMOTELY)

FOR THE PLAINTIFF:

NATHAN C. SANDERS, ESQ.
KENDRA E. SAMSON, ESQ.
NEAL & HARWELL, PLC
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
(615) 244-1713
jsanders@nealharwell.com

FOR THE DEFENDANT:

NATASHIA TIDWELL, ESQ.
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1684
NTidwell@mintz.com

DANIELLE BEREZNAY, ESQ.
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C.
555 12th Street, Suite 1100
Washington, D.C., 20004
(202) 434-7400
DMBereznay@mintz.com

COURT REPORTER:
ASHLEY C. HUELSMANN, RPR
CSR(IL)#084-004666, CCR(MO-1076)
LEXITAS LEGAL
1015 Avery Park Dr
Smryna, TN 37167
(615) 595-0073
(800) 280-3376



888-893-3767 www.lexitaslegal.com Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F California Firm Registration #179 LEXITAS

**A P P E A R A N C E S**

VIDEOGRAPHER:
CAROLINE HITTLER, CLVS
LEXITAS LEGAL
1015 Avery Park Dr
Smryna, TN 37167
(615) 595-0073
(800) 280-3376

ALSO PRESENT:

Dr. Geoffrey Lea



IT IS HEREBY STIPULATED AND AGREED by and between counsel for the Plaintiff and counsel for the Defendant that this Zoom deposition may be taken in shorthand by Ashley C. Huelsmann, a Registered Professional Reporter, Certified Shorthand Reporter (IL) and Certified Court Reporter (MO), and afterwards transcribed into typewriting; and the signature of the witness is expressly reserved.

(DEPOSITION STARTED AT 9:00 A.M. CST)

VIDEOGRAPHER: We are on the record. Today's date is October 31st, 2024, and the time is 9 o'clock a.m. Central Standard Time.

This is the video recorded deposition of Christopher Robinson, CPA, in the matter of United States of America ex rel Paul Dorsa v. Miracle [sic] Life -- Miraca Life Sciences, Case Number 3:13-cv-01025 in the United States District Court for the Middle District of Tennessee, Nashville Division.

This deposition is being held remotely via Zoom. The court reporter's name is Ashley Huelsmann. I'm Caroline Hittler. And we are with Lexitas Legal.

Would the attorneys present please



introduce themselves and the parties they represent? And then the court reporter can swear in the witness.

MR. SANDERS: Nathan Sanders from Neal & Harwell on behalf of the Plaintiff Paul Dorsa.

MS. TIDWELL: Natashia Tidwell and Danielle Bereznay from Mintz on behalf of Miraca Life Sciences.

* * * * *

CHRISTOPHER B. ROBINSON, CPA, of lawful age, produced, sworn and examined on behalf of the plaintiff, deposes and says:

**THE WITNESS: I do.**

COURT REPORTER: Thank you, sir.

DIRECT EXAMINATION

BY MR. SANDERS:

Q. Mr. Robinson, good morning. As I mentioned in the prelude there my name is Nathan Sanders. I represent the plaintiff, Paul Dorsa, in this case. And I'm going to be asking you some questions today. Could you state your full name for the record, please?

**A. Sure. Christopher Blair Robinson.**

Q. Have you given a deposition before, Mr. Robinson?



**A. I have not.**

Q. You were at least for some of the time present for Dr. Lea's deposition I guess a couple weeks ago; is that right?

**A. Yes, sir.**

Q. You have -- you have some sense of how this will go, but I'll give you a little bit of a refresher on the rules just to hopefully make this go a little bit more smoothly.

The first is, and you're doing a good job so far, answer audibly, please, when I ask a question. We've got a court reporter who's transcribing everything that we say and she won't be able to tell if you're nodding your head. You know, I will see you and understand it, but the record will not reflect that. So please answer audibly, yes or no, try to avoid head nods and gestures like that, okay?

**A. Yeah.**

Q. Does that make sense?

**A. It does.**

Q. Okay. And as we're going along today I will do my best to let you finish your answers before I start asking a new question. And I would ask that you let me finish my questions before you

**A. I'm sorry, in the first report?**
Q. Between the service of the first report, you finalized the first report, between that time and the completion of your supplemental report, did you receive any documents or evidence that caused you to change your opinions in this matter?
**A. I don't believe so, no.**
Q. Does the supplemental report -- and let's go ahead and pull it up on the screen actually.
MR. SANDERS: Are you guys getting these in the chat? Should be.
BY MR. SANDERS:
Q. Can you see my screen, Mr. Robinson?
**A. I sure can.**
Q. Okay. I'm just going to scroll through here, but does this appear to be your supplemental report that was served a couple weeks ago?
**A. It does.**
Q. And my question, as I cut myself off from asking was, was the purpose of this supplemental report to replace the initial report?
**A. My initial report?**
Q. Correct.
**A. No.**



Q. Okay. So which opinions in the initial report are you still offering in this matter?
**A. To the extent that Dr. Lea or Dr. Bohm are asserting Case 1 from their original reports, the opinions in my initial report with respect to that Case 1 applies.**
**In addition certain of the critiques of Dr. Bohm and Dr. Lea's methodology from the first report apply to Dr. Bohm and Dr. Lea's second report.**
Q. Are you still offering the opinion that beginning in 2016 Mr. Dorsa's compensation at Miraca had he not been terminated would have been reduced by 27 percent?
**A. So my opinion is that to the extent Mr. Dorsa's termination from IntegraMed was due to either personal lifestyle choices or due to poor performance, then it is appropriate to adjust Dr. Bohm and Dr. Lea's estimate of Mr. Dorsa's backpay to account for those historical facts to the extent that those are facts with respect to Mr. Dorsa's termination from IntegraMed.**
Q. Do you have any factual basis for assuming that Mr. Dorsa's termination from IntegraMed was as the result of either poor



performance or personal lifestyle choices?
**A. I do not have any specific evidence that -- for those two things to be true. I also don't have evidence that those are definitively false either.**
Q. You reviewed Mr. Dorsa's deposition transcript in preparing this supplemental report, correct?
**A. I did, yes.**
Q. And you're aware of his testimony that he was terminated from IntegraMed due to an acquisition, correct?
**A. I am aware of that testimony, yes.**
Q. And you -- you -- in fact, you discussed that testimony in one of your opinions in the supplemental report, correct?
**A. I do recall that, yes.**
Q. And you have no evidence -- you're not aware of any evidence in the record that you've seen contradicting Mr. Dorsa's testimony on that point, correct?
**A. That's correct.**
MR. SANDERS: I don't know if I did this, Ashley, but let's -- let's mark the initial report as Exhibit 1, and the supplemental report



will be Exhibit 2.
COURT REPORTER: Okay.
BY MR. SANDERS:
Q. And I'm going to pull the supplemental report back on the screen. Mr. Robinson, I want to go -- if you've got it in front of you, I want to go to Exhibit 4A to your supplemental report. Do you see my screen, Mr. Robinson?
**A. I can, yes.**
Q. You -- you disagree with Dr. Lea and Dr. Bohm as to the length of the damages period, correct?
**A. I'm sorry, you said didn't agree? I apologize.**
Q. Yes, that you disagree with them as to the length of the damages period, correct?
**A. Yes.**
Q. And you also disagree with them as to the way they treated the retention bonuses, correct?
**A. Yes.**
Q. Aside from those -- those two issues, am I -- am I correct in saying that you agree with everything else in Dr. Bohm's Dr. Lea's Case 2 assessment?
**A. I wouldn't say that I necessarily agree**

**with it. There is nothing else that comes to mind that I specifically disagree with.**
Q. There's nothing in this Exhibit 4A, aside from the treatment of the retention bonuses, that differs in any way from Dr. Bohm and Dr. Lea's Case 2 assessment, correct?
MS. TIDWELL: If you need to --
**THE WITNESS: Yeah, I'm sorry, can you repeat the question?**
BY MR. SANDERS:
Q. Sure. And let me actually qualify further. Aside from the end date of the loss period and the retention bonuses, there's nothing else in Exhibit 4A that differs from Dr. Bohm and Dr. Lea's Case 2 assessment, correct?
**A. I believe that's correct, yes.**
Q. And you don't intend to offer any opinions at trial that there's any other difference between your current calculation and Dr. Bohm and Dr. Lea's Case 2 assessment, correct?
**A. I'm sorry, can you repeat the question? I apologize.**
MR. SANDERS: Sure. Ashley, could you read it back? I really liked that one.
COURT REPORTER: Sure.



(WHEREIN THE REQUESTED PORTION OF THE RECORD WAS READ BACK.)
MS. TIDWELL: Do you mean the calculations in Exhibit 4A or his entire -- all of the calculations together?
BY MR. SANDERS:
Q. So here's what I'm -- here's what I'm trying to get at, Mr. Robinson, I want to know when we go to trial are you going to be offering any opinion that there's some other element of Dr. Lea and Dr. Bohm's Case 2 assessment aside from the retention bonuses and the loss period that you're going to opine on?
**A. I don't believe so, no. And just to clarify, I provide three different scenarios with three different end dates. Exhibit 4A represents one of those three scenarios.**
Q. So going back to my earlier question about your opinions in the initial report that you're still relying on, you're no longer relying on the calculations in the initial report as to what Dorsa would have earned through January of 2020, correct?
MS. TIDWELL: Objection to form, I...
MR. SANDERS: Do you understand --



(SIMULTANEOUS CROSS-TALK)
**THE WITNESS: Yeah, I'm sorry, can you just repeat the question one more time? I apologize.**
BY MR. SANDERS:
Q. That's okay. You're doing exactly what I told you to do, so I can't -- I can't be upset with you. My question is -- let me say it a different way and maybe this will be easier.
Understanding your caveat about there's different loss period scenarios and, you know, end dates for the loss period, setting that piece aside, Exhibit 4A in your supplemental report replaces the damages calculations in your initial report through January 14, 2020; is that correct?
**A. That is correct, assuming that Dr. Bohm and Dr. Lea are no longer asserting Case 1 from their initial report.**
Q. Help me understand that. What -- what -- what difference would it make to your analysis of -- of damages whether Dr. Bohm and Dr. Lea are still relying on Case 1 from the initial report?
**A. Well, Case -- Case 1 from the initial report is different from Case 2 in the supplemental report, and so the changes in -- so the assumptions**



**underlying Case 1 in Dr. Bohm's initial report are different from the assumptions that underlie Case 2 in Dr. Bohm's supplemental report.**
Q. Let me go at it this way. In the initial report your calculation of damages through January 14, 2020, was based in large part on Brian Dunphy's e-mail talking about alleged historical compensation at Miraca, correct?
**A. That was part of what I considered in determining my damages amount in the initial report, yes.**
Q. Okay. And in this report you have -- as Dr. Lea and Dr. Bohm you have relied on actual compensation records in arriving at your damages calculations here in Exhibit 4A, correct?
**A. Yes. In addition to the Brian Dunphy e-mail I received additional documentation that Dr. Bohm and Dr. Lea rely on for purposes of their Case 2 and similarly rely on those documentations to perform the calculations in Exhibit 4A.**
Q. And you would agree with me, would you not, that there -- that some of the records that Dr. Lea and Dr. Bohm relied on provide information that is inconsistent with what was in Mr. Dunphy's e-mail, correct?


888-893-3767 www.lexitaslegal.com Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F California Firm Registration #179 LEXITAS

Page 41

Q. How many times have you served as a damages expert for litigation?
**A. Three.**
Q. Does the three include this case?
**A. Yes.**
Q. And what are the other two cases where you've served as a damages expert for litigation?
**A. That is also in my CV. One of them relates to a case in bankruptcy report in 2020. And the other is a case in AAA arbitration, which you can see right there in the second bullet under expert reports and testimony.**
Q. What -- what opinions were you asked to provide in the bankruptcy matter?
**A. Generally I was asked to quantify damages associated with a working capital dispute between the debtors and an entity outside of the bankruptcy.**
Q. Any other matters you were asked to opine on in that engagement?
**A. Not that I recall, no.**
Q. How about the Dow Hydrocarbons & Resources arbitration, what kind of opinions were you asked to provide in that matter?
**A. I was asked to provide opinions as to**

Page 42

**damages related to a breach of contract in that matter.**
Q. What was nature of the contract?
**A. It was a shared services agreement between the Dow entity and the Blue Cube entity.**
Q. What type of damages were you calculating?
**A. Breach of contract damages.**
Q. Can you -- can you tell me more about that? I mean are we talking about, you know, loss of profits, are we talking -- you know, what kind of -- what was the nature of the alleged damage that you were looking at, beyond just it was part of --
**A. Sure, so the -- as I recall Dow had in its -- Dow -- Dow owned the rights to a structure that generated power on a site where Dow produced certain chemical products.**
**Blue Cube operations parent company also owned certain assets on Dow's site and there was a shared agreement on how the Blue Cube entity would reimburse Dow for energy that was produced at the site and consumed by both parties.**
Q. Are either of these two engagements we're looking at, are they still active?
**A. No.**

Page 43

Q. When was the Dow Hydrocarbon's arbitration?
**A. I believe it was early 2022.**
Q. Was there ever an arbitration hearing that you had to testify at?
**A. No.**
Q. So you just submitted the expert report in that one?
**A. That's right. And it subsequently settled prior to an arbitration hearing.**
Q. How about the Exide Holdings bankruptcy matter, when was that?
**A. October of 2020, I believe.**
Q. And did you ever provide any live testimony in connection with that matter?
**A. So I was -- for context, I signed an affidavit in that matter that was -- that I understand was submitted along with the confirmation hearing.**
**I was available for live testimony during that hearing, but no questions were asked of me during that hearing.**
Q. So am I correct that you've never -- prior to today you have not testified in either a deposition or in a live hearing or trial, correct?

Page 44

**A. That's correct.**
Q. Other than the engagements we've discussed, are there any other engagements where you've served as either a consulting expert or testifying expert in a legal dispute?
**A. Well, yes, over my 18-year careers -- or career I've assisted as a consulting expert other experts at the firm that I was working with involving matters of calculating economic damages.**
Q. And you've described a number of those in your CV, correct?
**A. Yes.**
Q. If we go to page 2 of your CV. It's the first full bullet point here at the top. That's describing this matter, correct?
**A. I believe it is, yes.**
Q. And you -- you could correct me and point me to the place if I'm wrong, but from my review none of these other engagements discussed in this CV involved calculating lost wages, correct?
**A. That's my recollection, yes.**
Q. How many times in your career have you provided an opinion or assisted someone else in providing an opinion on lost wages?
**A. So I recall two instances. One related**


888-893-3767 Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
www.lexitaslegal.com California Firm Registration #179
LEXITAS

**to a wrongful -- an allegation of a wrongful -- of wrongful -- lost earnings related to wrongful death. I assisted another expert in that matter, but it was very brief and didn't really go anywhere.**

**And in connection with advisory work I had done on behalf of a client I assisted in calculations related to a dispute involving the wages and earnings paid to certain employees.**

Q. Any other engagements where you provided an opinion or assisted someone else in providing an opinion as to lost wages?

**A. Not that I recall, no.**

Q. Okay. The first one you mentioned, you assisted someone or at least began to assist someone with calculating lost earnings in a wrongful death matter; is that correct?

**A. That's a fair summary, yes.**

Q. What year was this that you assisted in that engagement?

**A. I don't recall. I do recall it was a while ago.**

Q. More or less than ten years ago?

**A. I'd say about ten years is a reasonable estimate.**

Q. What was your role in that engagement?



**A. Doing research around properly calculating lost wage -- lost earnings in a wrongful death -- in the wrongful death -- in a wrongful death case.**

Q. You testified earlier the engagement was very brief and didn't go anywhere, did I hear that correctly?

**A. You did, yes.**

Q. How much time would you say you spent doing research?

**A. For that particular engagement a handful of hours.**

Q. Do you remember anything in particular that you researched?

**A. I remember reading certain portions of the Weil text, an earlier version, but certain portions of that text in connection with that engagement.**

Q. Do you remember which portions you remember looking at?

**A. It would have been the portion that relates specifically to lost wages and wrongful death cases.**

Q. And I know this is difficult to remember something you looked at ten years ago, but



do you remember anything specific within that section that you looked at?

**A. I don't, I'm sorry.**

Q. Do you recall any particular question you were looking to answer with your research?

**A. I think generally making sure that the methodologies were consistent with the other experts' understanding of calculating lost earnings in that circumstance.**

Q. Let me make sure I understand. But your -- your goal was to do some research to see if the person you were working with's approach was consistent with the literature; is that -- is that a fair summary?

**A. Yes, it is. Or in addition if there's anything in the literature that may not been considered by the other expert initially.**

Q. Anything else you recall doing on this engagement other than the few hours of research we've talked about?

**A. I don't believe so, no.**

Q. Okay. Then there was a second engagement you mentioned that involved assisting in the calculation of wages and earnings for various employees, did I hear that correctly?



**A. Yes.**

Q. When was that engagement?

**A. That was part of an engagement that initiated in 2021.**

Q. And you were assisting someone else at Ankura in that engagement?

**A. I was assisting a client directly as part of an Ankura team.**

Q. Was there a pending lawsuit that this related to?

**A. No.**

Q. What -- what was it specifically that you were asked by the client to do for this engagement?

**A. Basically the client indicated there may have been issues with certain calculations regarding how overtime was calculated for certain of the employees.**

**And so I was asked to perform calculations under various assumptions to determine what adjustments, if any, there would be if it was determined in fact there may have been some errors with how certain of the employees were paid.**

Q. Other than calculating overtime, is there anything else you were asked by the client to



Case 3:13-cv-01025 Document 258-2 Filed 11/18/24 Page 7 of 19 PageID #: 4180

do in connection with this engagement?
**A. There were other aspects of the engagement, but not related to any wages, or earnings or overtime calculation, no.**
Q. What was the concern that the employees had been underpaid?
**A. I don't know the nature of those -- of how that came about. I was just working with someone at the company who said there may have been issues with how the overtime was calculated.**
Q. You received a bachelor's degree from Indiana University in accounting and finance; is that correct?
**A. Yes.**
Q. I'm sure you're enjoying this football season more than -- than many others; is that right?
**A. Yeah, I got be honest with you I didn't see it coming. And anybody that I think argues otherwise I think is not telling the truth.**
Q. Well, I am a -- I'm one of the few lifelong Vanderbilt fans that exist, and we are also having a uncharacteristically good year, knock on wood. So I think we're -- we're sharing that experience a little bit.
**A. Yep, good for you.**



Q. Do you have any other degrees, other than your bachelor's degree from Indiana?
**A. I do not.**
Q. Do you have any professional certifications?
**A. I do.**
Q. What are those?
**A. I'm a Certified Public Accountant licensed in Illinois.**
Q. When did you obtain that license?
**A. 2008.**
Q. Did any of your studies at Indiana involve courses in economics?
**A. Excuse me. Yes, they would have.**
Q. Did you minor in economics or did you -- well, let me just start -- how many -- how many courses in economics would you say you took at Indiana?
**A. Well, I would say that at least two that were specifically related to economics, but I would also add that many of the finance and accounting courses that I did take while at Indiana had economic concepts involved in them.**
Q. Did any of your coursework touch on forensic economics?



**A. Not that I specifically recall, no.**
Q. Any courses you took that talk about how to calculate lost wages?
**A. At Indiana, no.**
Q. Correct. What about any -- any other courses or trainings that you've taken outside of your studies at Indiana that talk about how to calculate lost wages?
**A. Yes, I have.**
Q. Okay. Tell me about those, please.
**A. Sure. As part of -- so to continue to be a licensed CPA in Illinois that requires 120 hours of continuing professional education every three years.**
**And very -- and that continuing professional education for me has included since 2008 various economic damages issues, some of which included calculating damages related to individuals and lost earnings.**
Q. How many courses or hours would you say you've spent on presentations or courses that relate to calculating economic damages for individuals?
**A. Yeah, I'm not entirely sure about that.**
Q. Do you remember the last time you took a course -- and I'm calling it a course, I may be



using the wrong terminology, but the last time you obtained continuing education credit for a course or presentation that related to calculating individual economic damages?
**A. I don't specifically recall -- yeah, I don't specifically recall when the last one would have been that relates specifically to economic damages involving individuals.**
Q. Do you remember any courses that you have taken or presentations that you have attended related to calculating lost wages?
**A. So that -- so I was thinking of lost wages consistent with damages from individuals and lost earnings, so I think that same -- my previous answers relate to lost earnings, I sort of consider those -- or lost earnings, I consider those generally in the same area.**
Q. No, and I -- I appreciate the clarification. I think your term is actually better and more what I intended to ask.
So your answer is you don't specifically recall the last time you attended a course or presentation on how to calculate lost earnings; is that correct?
**A. Yes.**


888-893-3767 www.lexitaslegal.com Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F California Firm Registration #179 LEXITAS

Q. Is there any presentation or course that you remember attending at any point in your career specifically that relates to calculating lost earnings?
**A. I know that there definitely were some, I don't specifically remember the course or when I took it.**
Q. Do you remember any specific topics that were covered in those courses?
**A. I generally recall the topics in those courses being generally consistent with the guidance that I reviewed and cite in connection with this matter.**
Q. But you don't remember any specific presentations where particular topics were covered; is that fair?
**A. Yeah. Again, what I recall is the topic generally being the subject of the continuing education course. I don't specifically recall further detail from that or specifically a course or when I attended it.**
Q. Are you a member of any professional organizations?
**A. Yes.**
Q. Which professional organization --



excuse me, organizations do you belong to?
**A. So the Illinois CPA Society and the American Institute of Certified Public Accountants commonly referred to the AICPA.**
Q. Do you attend any events or presentations for those organizations?
**A. For the AICPA, yes.**
Q. What about the other one?
**A. I don't recall attending any events or continuing education through specifically the Illinois CPA Society.**
Q. And what types of events have you attended for the AICPA?
**A. Like, so I wouldn't say events, I would say I've -- the AICPA is -- issues -- is one of the organizations that puts out continuing professional education for CPAs, and so they would have been the collective author of certain of those continuing professional education courses that I would have taken.**
Q. Have you published any papers or books in your career?
**A. I have not.**
Q. Any articles?
**A. I have not.**



Q. Have you given any presentations in your career? And that's probably a bad question. Let me rephrase it.
Other than presentations to clients and colleagues that you're working with on a specific engagement, have you given any other type of professional presentation to, you know, a professional organization or something like that?
**A. No, not that I recall.**
MR. SANDERS: So I think this is a good stopping point for a break. Can we go off the record, please?
VIDEOGRAPHER: We're going off the record. The time now is 10:21 a.m.
(THERE WAS A BREAK.)
VIDEOGRAPHER: We are back on the record. And the time is then 10:31 a.m. Central Standard Time.
BY MR. SANDERS:
Q. Mr. Robinson, I'd like to spend the next segment going through some of the opinions in your supplemental report.
But let me -- let me first ask as a general matter, are there any assumptions that you made in developing your opinions in the supplemental



report that are not disclosed in that report?
**A. I don't believe so, no.**
Q. Let's pull up Exhibit 2 again. I got so good at this during COVID, but now it's -- I feel like I'm fumbling around trying to get the documents on. Hold on a second. Okay. Can you see my screen again?
**A. I can.**
Q. And I'm going to scroll while I'm talking, but one -- one of your opinions in this supplemental report is that the lost period should end on January 14, 2020, correct?
**A. That's correct.**
Q. You provide -- I understand you provide two other alternatives, but one of your opinions is we should treat the end of the period on January 14, 2020, right?
**A. Yes, that's correct.**
Q. And one of your critiques of Dr. Lea and Dr. Bohm's supplemental report is that they treat the loss period as continuing through December 31st of 2022, right?
**A. Yes.**
Q. And here -- here on page 5 of your report one of your critiques is there's no new


LEXITAS

**A. Yes, it is.**

Q. I'd like to -- I'm going to scroll down to the section Establishing the Loss Period, and I would like you to please read this first paragraph and let me know when you're finished.

**A. So read that paragraph into the record?**

Q. No, just -- just read it yourself and let me know me when --

**A. Okay. Okay, I've read it.**

Q. So this -- this source that you relied on is also acknowledging that the loss period may be based on work-life expectancy, correct?

**A. It may be, but it's also facts and circumstances specific.**

Q. But this source acknowledges that one of the ways that forensic economists calculate the loss period is by looking at the work-life expectancy, correct?

**A. I would agree with that.**

Q. And another way is by looking at the retirement age, correct?

**A. That is a consideration in establishing the loss period, yes.**

Q. And Dr. Bohm and Dr. Lea established an end of the loss period that was shorter than both



work-life expectancy and retirement age, correct?

**A. Yes, they did do that.**

Q. Let's go back to your report, which I think I can just flip over. You're assuming in your -- well, let me orient us.

I'm back in the section of your report where you're offering the opinion that Dorsa would have stopped working at Miraca on January 14, 2020. Are you familiar with that part of your report?

**A. Yes, I would say my opinion is slightly different than how you characterized it, but.**

Q. Okay. So tell me how you would recharacterize it.

**A. Sure. I would say that it's based on my review of the historical record. It is reasonable to assume that Dorsa effectively retired on January 14, 2020.**

Q. January 14th, 2020, was Mr. Dorsa's last day of employment at CDI, correct?

**A. That's my understanding, yes.**

Q. You're aware that Mr. Dorsa was terminated by CDI without cause; is that right?

**A. I'm aware of that, yes.**

Q. Okay. So you're -- you're assuming that because Mr. Dorsa was terminated from CDI



without cause on January 14th, 2020, that means he would have voluntarily resigned from Miraca on that same day, correct?

**A. That's not what I'm assuming.**

Q. How do you get January 14, 2020, as the end of the loss period in this portion of your opinion?

**A. Because based on the documents that I reviewed and the analysis that I conducted it is -- in my opinion it is reasonable to assume that Dorsa in fact effectively retired on January 14th, 2020.**

Q. You're assuming that he effectively retired the date that he was involuntarily terminated by CDI, correct?

**A. That effective date, yes.**

Q. Do you have any explanation for why the date that he was terminated by a different employer involuntary has any bearing on when he would have voluntarily resigned from Miraca in a hypothetical world where he's never terminated?

MS. TIDWELL: Objection to the form.

**THE WITNESS: Well, no, the basis of my opinion is -- is when he retired in the real world. Depending on -- as -- as Dr. Bohm and Dr. Lea point out when he actually retires my understanding and**



**based on my calculations is that he would no longer be entitled to lost wages after the date he actually retires in the real world.**

BY MR. SANDERS:

Q. So you're not offering an opinion that Mr. Dorsa would have retired on January 14th, 2020, had he still been employed at Miraca?

**A. It's possible that he may have, but no, my opinion is what I just -- is what I said earlier.**

Q. Well, help me understand that. Your -- your calculations we looked at earlier in Exhibit 4A they treat January 14, 2020, as the end point of the damages period where backpay accrues, correct?

**A. Yes.**

Q. So you are assuming, are you not, that Mr. Dorsa would have resigned from Miraca and retired on January 14, 2020, correct?

**A. That's not my -- I would not characterize my assumptions as that, no.**

Q. How would you characterize it?

**A. I believe I've answered this, but I'll answer it again. Mr. Dorsa's loss period ends on the date that he actually retires in the real world. Dr. Bohm and Dr. Lea, as I understand it, disagree on the date that Dorsa actually retired.**


888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F
California Firm Registration #179
LEXITAS

**And so when I prepared that analysis and prepared Table 1 it demonstrated to me that it appears that Mr. Dorsa -- the volume of the e-mail traffic between Dorsa and potential employers went down significantly subsequent to his employment at CDI. That indicates to me, and further supports an assumption that Mr. Dorsa effectively retired January 14th, 2020.**

Q. You also opine that had -- had Mr. -- you know, in your -- in your calculation that when Mr. Dorsa would have retired from Miraca in January of 2020 he would have done so without receiving any type of severance, correct?

**A. Yes, in -- in -- in the scenario -- in a scenario where an employee -- under -- under -- my understanding under Dorsa's agreement he would not be entitled to severance if he were to have retired.**

Q. In another portion of your report we're going to look at in a little while you calculate severance to be over $500,000, correct?

**A. I'd have to look at the section and the amounts, but yes, in those two specific scenarios I do calculate severance as part of my assumption.**

Q. And it's a substantial amount of money, right?



**A. It's -- I think that's a relative term. It -- it represents roughly a year and a quarter of his salary plus a proration of his STI bonus.**

Q. Let's scroll down just a little bit and we'll get -- maybe up. Let me find it. I think we're going to have to find the exhibit. Do you see my screen? I'm looking at Exhibit 4B.

**A. I do, yes.**

Q. And you see in this table to the far right it has severance $558,416?

**A. Yes, I see that.**

Q. Your -- your assumption in this report is that Dorsa would have retired from Miraca on January 14th, 2020, without receiving any of this severance at the time he retired?

**A. That is not my assumption. I've explained that that's not my assumption several times.**

Q. So you're not assuming that Mr. Dorsa would have voluntarily given up half million dollars by resigning in 2020?

**A. No. Again, my assumption is that Mr. Dorsa effectively retired at January 14th, 2020. My understanding in calculating lost wages is that at the date -- at the date in the real world Mr. Dorsa**



**actually retires he is no longer entitled to lost earnings subsequent to that time. That's consistent with Dr. Bohm and Dr. Lea's approach in Case 1 in their original report.**

Q. So your -- your opinion is you don't need to consider how long Mr. Dorsa would have stayed at Miraca, you can just use whatever you determine is the retirement date in the real world where he was terminated by Miraca; is that -- am I characterizing your testimony correctly?

MS. TIDWELL: Objection as to form.

**THE WITNESS: So in the real world -- my understanding based on the guidance that I cite and that I read is if that in the real world the plaintiff actually retires at some point prior to their work-life expectancy or where they indicated they may have retired at a different point in time is -- is what would determine the end of a loss period.**

**My understanding in a proper lost earnings calculation is it is improper to calculate lost earnings after the time when somebody in the real world actually does retire.**

BY MR. SANDERS:

Q. Is that your opinion even if what



happened in the real world led to that retirement?

**A. I'm sorry, I don't understand the question.**

Q. Let me -- let me -- I'll give you a hypothetical. Let's say somebody's terminated -- wrongfully terminated, unable to get subsequent employment and they eventually decide to leave the workforce because they can't find any employment.

I'm not asking you to agree that that's the scenario we have, but I'm asking in that scenario do you still just look at the actual retirement date to determine how long they would have worked at their former employer had they stayed there?

**A. So -- what I would say is to the extent -- to the extent a legal determination is made that that person attempted to find work for a long period of time, then you would not necessarily -- again, this is facts and circumstances specific, you would not necessarily end the loss period at the time of that individual's last employment.**

**However, based on the facts and circumstances here it appears to me that Mr. Dorsa effectively retired at January 14th, 2020. In that specific circumstance here, in my opinion, it is**

**reasonable to assume that he retired on January 14th, 2020, based on the analysis that I conducted and that he would no longer be entitled to lost earnings after that date.**

Q. You're not offering an opinion, are you, as to whether there were other comparable jobs available to Mr. Dorsa after January 14th, 2020, are you?

**A. I'm not offering an opinion on that, no.**

Q. Do you remember what was going on in the world back in 2020?

**A. I do.**

Q. Do you remember the COVID pandemic?

**A. I do.**

Q. You haven't done any type of analysis to determine whether that may have impacted the number of comparable jobs that were available to Mr. Dorsa; is that correct?

**A. Yeah, my analysis doesn't -- doesn't contemplate whether there were or were not jobs available. It contemplates what Mr. Dorsa's efforts to find employment are.**

Q. And your assessment of those efforts is based solely on the number of what I'll call job



search e-mails that you received and that were produced in this case; is that correct?

**A. That is -- that analysis is -- is the -- is my indication of what Mr. Dorsa's job efforts looked like contemporaneously, yes.**

Q. And just -- and I'm just clarifying, just the e-mails you're basing that on, right?

**A. Yeah, and -- well, and the September 2020 e-mail wherein he states he retired from CDI.**

Q. The e-mail where he's talking about a potential board position with the company, correct?

**A. That's right.**

Q. You don't know how frequently Mr. Dorsa may have talked with recruiters or potential employers on the phone; is that right?

**A. Yeah, I have no basis one way or the other to determine whether he talked on the phone to employers and how often that would have occurred.**

Q. You don't know how many interviews or in-person meetings he may have gone to during this period, correct?

**A. I do not.**

Q. Before we move on from this I just -- I want to make sure I understand this. You are not --



you are not opining that had Mr. Dorsa still been employed at Miraca --

MR. SANDERS: Well, strike that. Let me start over.

BY MR. SANDERS:

Q. You are not opining that if Mr. Dorsa had not been terminated in 2013 he would have voluntarily resigned from Miraca in January 2020 without severance, correct?

MS. TIDWELL: Objection as to form.

**THE WITNESS: That is not my opinion.**

BY MR. SANDERS:

Q. So the answer is yes, that's correct?

**A. Yes, that's correct.**

Q. Mr. Robinson, let's stay with this -- stay with the report and I want to go to the next section where you offer the opinion that Dorsa would have been terminated no later than I believe July 17th, 2018, correct?

**A. Yes, that's the opinion in my second scenario.**

Q. Okay. I'm going to find it. Give me one second, sorry. I want you to focus on page 9, Paragraph 27.

**A. I'm there.**



Q. Okay. You say: Avista Capital Partners completed its acquisition of Miraca in November 2017; do you see that?

**A. I do.**

Q. And then you write: Miraca experienced significant management turnover in connection with the acquisition. Correct?

**A. Yes.**

Q. All right. And if you go down, the two sentences I just read from, they have two footnotes. The first footnote, 25, is to a Avista Cap -- looks like the Avista website, correct? Footnote 25?

**A. Yes.**

Q. And then the second footnote, 26, cites to Miraca 1938, correct?

**A. Yes.**

Q. Okay. Are there any other documents or sources that you are relying on for your conclusion that the Avista acquisition resulted in management turnover?

**A. Not that I can think of, no.**

Q. You weren't given any additional information about this acquisition from counsel?

**A. Not that I recall.**

Q. And don't recall seeing any other

**A. I have.**

Q. And do you recall seeing a provision in that agreement that says the severance is going to be paid out at some future date after execution of the agreement; do you recall that?

**A. Generally recall that, yes.**

Q. Okay. So -- so if that's paid out after January 14, 2020, why does the mitigation factor -- why does that severance factor into the mitigation in this scenario?

**A. Because that -- because that severance was earned -- it's not based on when it was paid, it's when it was earned, and so that mitigation would have been earned prior to and including January 14th, 2020.**

Q. So you don't credit Mr. Dorsa for getting a severance from Miraca here, but you do count the severance from CDI in the mitigation, correct?

**A. Well, the mitigation, those are -- those are real dollars that he actually received in the real world, so my understanding is that those mitigation dollars should be included.**

**And again, my assumption about what he -- about 2014 is again not necessarily that he**



**would have left Miraca voluntarily or not voluntarily on January 14th, 2020, but that because he effectively -- my assumption is he effectively retired on January 14th, 2020, and so as of that date he is no longer entitled to future lost earnings because he effectively retired in the real world on January 14th, 2020.**

Q. Let's go to your last -- what I'll call your last opinion -- or at least the last one I want to ask you about in your report.

Let me see, we're on page -- I think it's Section C, page 10 of your report. Your third alternative for a conclusion of the loss period is January 2014, correct?

**A. Yes.**

Q. And so that -- you arrive at a damages period that's less than four months in that -- in this section of the opinion, correct?

**A. Yes.**

Q. Of all these three alternatives that we've talked about, do you have an opinion as to which loss period is the most reasonable?

**A. No, I think they're all reasonable assumptions to consider.**

Q. So you don't -- you don't intend to



advance one versus the other in front of the jury, you're just -- you've laid out three options and it's up to the jury to decide which one is the most reasonable?

MS. TIDWELL: Objection.

**THE WITNESS: Generally that's how I think about it, yes.**

BY MR. SANDERS:

Q. Your -- your opinion that -- well, let me -- let me back up. Your opinion in this third section of the -- of your supplemental report, you arrive at a January 2014 termination date by averaging the length of five of Dorsa's successors in that same position, correct?

**A. Yes, that's a fair characterization, yes.**

Q. And you come up with an average tenure length of 504 days, right?

**A. I believe it's 506 days, yes.**

Q. 506, okay. It is 506. And then you apply that average back to Mr. Dorsa's start date at Miraca on August 2012, correct?

**A. Yes, that's right.**

Q. And that's how you get to January -- and I should say the specific date -- January --



what -- January 8th, 2014, right?

**A. Yes, correct.**

Q. And the five successors' tenures that you've looked at that was -- those were successors from 2014 to 2022, right?

**A. That's correct.**

Q. You -- you don't have any information, do you, as to why these individuals' tenures at Miraca ended; do you know for any of them --

**A. Not specifically. What I do know is that both Norkett and Zaves were terminated in March and July of 2018 respectively, but beyond -- I just know that they were, but beyond the why I do not have any other information on that, no.**

Q. But you don't know why Zaves left Dorsa's position to take a different role, correct?

**A. I do not specifically know that, no.**

Q. And you used not Dorsa's entire Miraca tenure in your average calculation, you used only that period of time where Mr. Zaves was in Mr. Dorsa's role, correct?

**A. Just the period of time that Mr. Zaves was in Dorsa's role, correct.**

Q. Wouldn't you need to know why someone left this role at Miraca to know whether they're a



Case 3:13-cv-01025 Document 258-2 Filed 11/18/24 Page 13 of 19 PageID #: 4186

Page 117

good proxy for calculating Mr. Dorsa's tenure?

**A. I don't think so. The guidance that I cite doesn't indicate a necessity to specifically understand the reason for each -- of each employee to leave.**

**I believe it just states that examining employee turnover can provide a reasonable basis for how long somebody might stay at an employer. And so based on that guidance I conduct my analysis.**

Q. And I'm -- we're going to look at that in a little while, I want to come back to that. But -- let me ask this. If John Norkett -- for example, if we learn that he left his position at Miraca to take a higher paying job at another place, that wouldn't tell us anything about when Dorsa may have been terminated without cause at Miraca, would it?

**A. Well, it -- if -- it may inform us our estimate that Dorsa may in fact have left at or around the same time also for a higher paying position.**

**In other words, in -- in a hypothetical where Mr. Dorsa is continuing to work at Miraca, he may leave for any -- for any of the reasons that other employees may have left.**

Page 118

Q. Well --

**A. And that's -- go ahead, I'm sorry.**

Q. I'm sorry. I apologize, I didn't mean to cut you off.

**A. No, no, I'm finished.**

Q. So I want to be clear about this, your -- your opinion in this section of your report you're making an assumption about when Dorsa would have been terminated by Miraca without cause, correct?

**A. I am making an assumption on how long his tenure at Miraca would have been based on the tenure of five other people that assumed his duties.**

**And as part of that assumption I assume that -- I suppose I could have assumed severance or not severance, but in that circumstance I selected to choose that he would receive severance in that circumstance and that's what I calculated.**

Q. And the only circumstance in which he gets severance is termination without cause, change in control, or departure, resignation for good reason, correct?

**A. That's right. I think the way that I thought about it at the time was I could have assumed severance, I probably could have assumed no**

Page 119

**severance, ultimately I decided the more reasonable assumption would be to include severance in that circumstance.**

Q. Imbedded within that calculation of severances, this is not a time period where Paul Dorsa leaves voluntarily because otherwise he wouldn't get severance, right?

**A. Well, again it could have been. There are -- there are circumstances where he could have left Miraca voluntarily. There are circumstances where he may not have left Miraca voluntarily.**

**Severance obviously is dependent on which of those two assumptions -- or which of those two facts actually would have occurred in the but-for world.**

**But for purposes of my analysis I assume that he would be entitled to severance for purposes of my scenario three. And inherent in that assumption is that he would have for whatever reason been entitled to severance had he left Miraca on January 8th, 2014.**

Q. Let's -- let's -- let's go with the different example. There's -- I believe her name is Patty Sipes, she's one of the individuals who held this position I believe in the 2021/2022 time frame.

Page 120

If we had information that financial pressures caused by the COVID pandemic caused Miraca to terminate Ms. Sipes, that wouldn't tell us anything about when Dorsa -- how long Dorsa would have been employed when he started at Miraca back in 2012, would it?

**A. Well, again, what I would say is that generally speaking employee turnover informs how long somebody would have stayed at a company.**

**So I examined the employee turnover here, and I come up with an average as a reasonable estimate for what Dorsa's lost wages would have been. Consistent with what the guidance that I reviewed states should be considered.**

Q. So if one of these individuals who succeeded Mr. Dorsa had to leave their employment after a year because of a medical issue, is it your testimony that the length of that tenure would shed light on how long Dorsa would have been employed at Miraca?

**A. It certainly can. And the reason for that is because we don't know if Mr. -- Mr. Dorsa may have -- could have had some similar issue.**

**The point is we don't know how long Mr. Dorsa would have stayed at Miraca. It's reasonable**

**to assume that he may have left under a variety of circumstances, and he may have -- and I assume that he would have left in a -- at a time period consistent with other people that took on his duties.**

**There can be a variety of reasons why he may have left Miraca in the -- in the but-for world, and so I use that as a proxy for those five -- for the average tenure of those five other people.**

Q. And it's your opinion that you don't need to know any information about why those individuals left the position to be able to then take that average and apply it backwards to Mr. Dorsa; is that right?

**A. The guidance doesn't say that I need to know that information, no.**

Q. And the guidance you're talking about is the Litigation Services Handbook; is that right?

**A. Yes.**

Q. Is there any other source or authority you're relying on for this portion of your opinion, other than that handbook?

**A. Well, I would say that the other guidance I cite generally is consistent with the**



**idea of using the historical record to inform the estimate, so broadly, yes.**

**But specifically as it relates to looking at peer employee tenure I believe it's the Weil handbook, and I believe there might be some information in 2004 AICPA guide that is similar in that effect.**

Q. Can you say the last one again, please?

**A. I'm sorry, the 2004 AICPA guidance that we looked at earlier.**

Q. You think that one talks about normal employee turnover and how to use that?

**A. Well, I think what it says is -- it says something to the effect of that looking at what happened to peer employees at the company informs the estimate.**

Q. Let's look at that again, because I -- I want to make sure I understand which part you're talking about.

**A. Sure.**

Q. So here's -- this is Exhibit 4. This is the measuring damages document I believe you were just testifying about?

**A. Yes.**

Q. Is it in -- is the part you're



referring to in this section talking about --

**A. I'm sorry. I don't believe so. I believe it's on page 81 and 82 of this document -- either 81 or 82, somewhere thereabouts.**

Q. And I don't think we've got 81 or 82, so we -- we might -- we may be able to get that at a break, but we can -- we can leave that alone for now.

As I'm understanding your opinion on this issue, wouldn't -- wouldn't the average tenure length of Dorsa's predecessors also be relevant in calculating how long he would have remained at the company?

**A. It may, but I believe the guidance that I cite specifically indicates the post incident, but I'm -- as I recall.**

Q. All right. Let's -- let's go ahead and look at this, and I'll -- you can see my screen, but here's -- this will be exhibit -- I've got it marked as Exhibit 10 on this screen, but what --

MR. SANDERS: I'm sorry, Ashley, what number are we at?

**THE WITNESS: We're on No. 9.**

MR. SANDERS: No. 9, okay. So we'll -- we'll have to rename this. This will be Exhibit 9.



BY MR. SANDERS:

Q. So Mr. Robinson, you see my screen?

**A. I do.**

Q. Okay. And I've -- and I've kind of done the same thing as I've done with other exhibits, but I've tried to give us an excerpt here. But you see the top where it says: Litigation Services Handbook: The Role of the Financial Expert?

**A. I do.**

Q. And it's got Chapter 13, Lost Earnings of Persons; do you see that?

**A. I do.**

Q. Does this -- does this appear to be -- it may be in a different form, but does this appear to be the source that you cited in your report for the point about normal employee turnover?

**A. It -- it does appear that way. I'd have to look at the section once we get there, but it appears to be the same source.**

Q. Okay, all right. And as I scroll down -- well, I've got to find it, too. I get lost in this.

Okay. I believe it's under Section 13.5(e) in this version of the Litigation

Page 125

Services Handbook called Period of Loss; do you see that?

**A. I do.**

Q. Okay. And as we go down, I've scrolled to the second page, we're still under Period of Loss. This is -- I guess it's not paginated, my apologies. I believe this may be the paragraph we're looking for here, it says --

**A. That looks correct, yes.**

Q. I'd ask you to read that, if you would, please.

**A. I see that. Give me one second. And this is the same -- just -- this is the same version or -- that I cite in the report?**

Q. I guess I can't guarantee that, I'm not sure, that would be a question I have for you. Do you notice any difference --

**A. Yes --**

Q. -- in the language --

**A. -- no, the only --**

Q. -- of the version you relied upon?

**A. Sorry about that. I just don't recall -- it might be in there, I just don't recall that last second sentence. But in any event the rest of this paragraph is familiar to me, so we can**

Page 126

**continue.**

Q. Is there anything in this paragraph that says you should limit an examination of normal employee turnover to an employee's successors in a position?

**A. It does not appear so, no.**

Q. So back to my -- my previous question, shouldn't this type of analysis if you're going to do it also consider the length of an employee's --

MR. SANDERS: Strike that.

BY MR. SANDERS:

Q. Shouldn't this type of analysis also include an examination of the average tenure length of an employee's predecessors?

**A. It certainly could. I don't see any reason why it couldn't.**

Q. Do you have any basis for distinguishing between predecessors and successors for purposes of performing this type of analysis?

**A. Well, what I would say is, it says: Examining employee turnover without specific reference to either before or after the incident.**

**And the information that I had in this case related to those that assumed his position after the incident, and so that's what I used for**

Page 127

**purposes of my analysis.**

Q. But you don't have any reason for saying -- or for -- you don't have any reason to believe that predecessors should not be included in this type of analysis, correct?

**A. I certainly can't say that they shouldn't be, no.**

Q. Are you aware of the fact that Mr. Dorsa's immediate predecessor held his position for about seven years?

**A. Not aware of that.**

Q. That would dramatically alter the average in your calculation, wouldn't it?

**A. I don't know about dramatic, it may alter it.**

Q. Well, I'm -- I'm -- nobody's every accused me of a math wizard, but 365 times 7 is 2,555 days, correct? Sound right?

MS. TIDWELL: Objection. Unless you're going to give him a calculator, so.

**THE WITNESS: Yeah, I don't know one or the other. I have no -- I have no reason to believe that that's correct or not correct.**

BY MR. SANDERS:

Q. I'll represent to you that that's

Page 128

correct.

**A. Okay.**

MS. TIDWELL: You just said you're no math wizard, Nathan.

MR. SANDERS: Well, I've got -- I'm cheating, I've got a calculator.

MS. TIDWELL: Okay.

BY MR. SANDERS:

Q. And so I'm back on your report, and I'm going to the average tenure work page if I can find it. Here we go. So the longest tenure we have here is 933 days, right?

**A. Yes.**

Q. So if you added in 2,555 that would increase this average meaningfully, wouldn't it?

**A. It would increase it, yes.**

Q. It would change your calculation, correct?

**A. It would change my calculation, yes.**

Q. Did you ask Miraca for information about Mr. Dorsa's predecessor?

**A. I don't believe that I did.**

Q. Is there any reason why you didn't?

**A. Not that I can recall, no.**

Q. Did you ask for information about the

person who's currently holding Mr. Dorsa's position?
Since 2022?
**A. I did not. I relied on the interrogatory response that was on that page for purposes of my calculation.**
Q. Is there a reason why you didn't ask for the averaged tenured length -- information about the average tenure length of the individuals or individual who held that position since 2022?
**A. I don't -- I don't -- I don't know that there's a reason that I didn't, no.**
Q. And your calculation does not consider the length of other Miraca executives' tenures, does it?
**A. It -- no, it only includes the tenures of those that held Mr. Dorsa's position.**
Q. Does this -- and I'm flipping back, and I'll put it back on the screen. Does this source you've cited, the sentence we looked at about examining normal -- examining normal employee turnover, does it say anything about limiting that examination to only those individuals who held a particular position?
**A. Not specifically, no.**
Q. Did you do any research -- well, let me



back up. Is there anywhere else in this source that we're looking at, other than this sentence, that talks about examining normal employee turnover?
**A. Not that I recall, no.**
Q. Did you do any -- any research or further investigation as to what this language might mean?
MS. TIDWELL: Objection. Which -- which language?
MR. SANDERS: The language -- the sentence about examining normal employee turnover.
BY MR. SANDERS:
Q. Did you do any further research investigation to see what other sources might have to say about the consideration of employee turnover in a damages analysis?
**A. So as I testified before I think this general concept comes up in the 2004 guidance that I cite. But generally, no, my process here was I read this guidance, this guidance states that examining turnover can help answer the question of how long a person would have stayed employed at a particular employer but for the alleged wrongful termination.**
**I had the information that I had from -- related to the five executives that assumed**



**Dorsa's responsibilities after he left and conducted my analysis accordingly.**
Q. Are you aware of any source or authority that looks at the average length of an employee's successors' tenures and then retroactively applies that average to the employee to determine the loss period as you've done here in your expert report?
MS. TIDWELL: Objection, form of the question.
MR. SANDERS: You can answer, Mr. Robinson.
MS. TIDWELL: Objection.
**THE WITNESS: Am I -- am I aware -- I am not aware of other -- of actual studies that examine -- I'm sorry, can you repeat the question? I apologize.**
MR. SANDERS: That's okay. Ashley, could you read it back, please?
(WHEREIN THE REQUESTED PORTION OF THE RECORD WAS READ BACK.)
MR. SANDERS: I believe that should've said employee's tenures.
**THE WITNESS: I'm not specifically aware of any, no.**



BY MR. SANDERS:
Q. I'd like to show you - and this will be a little bit confusing for our -- I guess for everybody, but it says Exhibit 9 on my screen, but we'll call this Exhibit 10.
And I'll dump both of these into the chat now. Do you see my screen, Mr. Robinson?
**A. I can, yes.**
Q. I believe you -- you -- when you were forming your opinions you looked at the LinkedIn profile of Mr. Dorsa; is that correct?
**A. I did, yes.**
Q. Okay. This is actually a combined document, and I'm going to scroll down past this LinkedIn profile and I'm going to go to page 5 of the document. You see where it says at the top: Miraca Life Sciences?
**A. Yes.**
Q. Okay. If you scroll down further, do you see at the bottom of the second page where it says: Copyright 2012, Miraca Life Sciences?
**A. I do see that, yes.**
Q. Okay, all right. You see at top where it Steven J. McMindes?
**A. Yeah, can you blow it --**


Case 3:13-cv-01025 Document 258-2 Filed 11/18/24 Page 17 of 19 PageID #: 4190

despite having different roles and more expansive roles you did consider the average length of these employees' tenures in your analysis, correct?

**A. Yes, but I -- but I included them in my analysis because they had -- they included in their roles and responsibilities were those that Dorsa would have been performing.**

Q. And going back to Exhibit 10 -- I understand you're just seeing this document, you can't draw any definitive conclusions, but my -- my question is simply, is it one reasonable possibility based on these documents that Mr. McMindes held the role of Senior Vice President Commercial Operations for seven years?

**A. It is possible that that's the case, yes. I don't know whether or not those responsibilities were the same as Dorsa's or not, but they certainly could have been.**

Q. Let's go back to Exhibit 9. We've been focused on this sentence about examining normal employee turnover. And I want to scroll up to the top of -- of this same subsection Period of Loss, and if you would, take a second please to read those first two paragraphs after Period of Loss.

**A. Sure. Okay, I've read it.**



Q. Well, before -- before I get to that. The sentence we've been looking about normal employee turnover, it doesn't -- it doesn't instruct that you have to consider employee turnover, does it? And I'll scroll down, it's not a --

**A. Yeah, right. Yeah, it simply says: Examining employee turnover can help answer the question of how long a person would have stayed with a particular employer, but for the alleged wrongful termination. So it can help answer the question.**

Q. But it doesn't say you must consider normal employee turnover, does it?

**A. It does not.**

Q. And it does not say normal employee turnover is the only thing you consider, correct?

**A. Correct.**

Q. And in fact the portion that I asked you to read a couple minutes ago provides instructions of other things to consider, correct?

**A. Yes.**

Q. It says when establishing the damages period the expert should consider items such as the individual's pre-incident health conditions, family circumstances, actual work history, financial incentives, such as deferred compensation or early



retirement incentives, general market conditions in the individual's industry and any contracts that directly affect the individual's work-life expectancy; did I read that correctly?

**A. Yes.**

Q. You didn't consider any of these factors in arriving at your opinion that Mr. Dorsa would have been terminated in January of 2014, correct?

**A. No, that's not true, I did.**

Q. Well, explain that to me. How did those factors factor into your analysis that Mr. Dorsa would have been terminated in January of 2014?

**A. So I believe in my report I reference his actual work history, and I reference certain of his testimony that indicates he was always looking for a job even while he was employed.**

Q. But when it comes to determining when the loss period ends for this piece of the opinion, that's based exclusively on taking the average tenure length of those five successors and then applying that back to Dorsa, is it not?

**A. For the specific date, for the specific assumption, yes, that's what my calculation does. However, as I point out there's other factors I**



**considered when determine -- when contemplating that assumption. And one of those factors includes Mr. Dorsa's actual work history and it also includes excerpts from his testimony.**

Q. But none of those other factors that you were saying you considered caused you to adjust in any way the 506-day calculation that you derived from looking at the successors length of tenure, correct?

**A. No, those factors did not have a direct impact on my calculation of the 506 days. They were part of the consideration for that assumption.**

Q. Are you aware that Mr. Dorsa's contract term was five years?

**A. I'm generally aware of that, yes.**

Q. Are you also aware of the fact that there's a provision stating that after those five years it automatically renews every year?

**A. I recall language to that effect, yes.**

Q. Why didn't that contract and those provisions have any impact on your analysis?

**A. Well, I certainly -- I certainly considered his employment agreement and those terms, but my -- but my three scenarios are agnostic to those specific terms in the agreement because the**



Case 3:13-cv-01025 Document 258-2 Filed 11/18/24 Page 18 of 19 PageID #: 4191

**circumstances under which you would leave in those circumstances I have accounted for.**

Q. The -- the length of his employment term in his contract did not have any bearing on your calculation of 506 days is when he would have been terminated without cause, correct?

**A. It did not, correct.**

Q. Did you see -- for any of the five successors you looked at, did any of their employment agreements have a term as long as five years?

**A. I don't recall.**

Q. Sitting here today you can't identify one that was five -- as long as five years?

**A. Again, there may have been, but I don't recall.**

Q. It's not something you considered?

**A. I did not consider the length of the other individual's employment contracts specifically for purposes of my 506-day calculation, no.**

MR. SANDERS: All right. Let's go off the record if we can, please.

VIDEOGRAPHER: We're going off the record. The time is 1:08 p.m.

(THERE WAS A BREAK.)



VIDEOGRAPHER: We are back on the record. The time is now 1:17 p.m.

MR. SANDERS: Mr. Robinson, I don't have anymore questions at this time. I appreciate your time today. Thank you.

**THE WITNESS: Thank you.**

MS. TIDWELL: Can we go back off the record just for one minute?

VIDEOGRAPHER: We're back off the record. The time is 1:17 p.m.

(THERE WAS A BREAK.)

VIDEOGRAPHER: We're back on the record. The time is now 1:19 p.m.

MS. TIDWELL: We do not have any questions for Mr. Robinson.

COURT REPORTER: Signature? Does signature apply in this case?

MS. TIDWELL: I --

MR. SANDERS: Sorry, she's asking you if you want to read and sign.

MS. BEREZNAY: Read and sign.

MS. TIDWELL: Oh, yes, I'm sorry. Yes, please, thank you.

VIDEOGRAPHER: That will conclude deposition. The time is 1:20 p.m. Central Standard



Time.

MR. SANDERS: E-tran, video synced.

MS. TIDWELL: E-tran, video synced.

(THE DEPOSITION WAS CONCLUDED AT 1:20 P.M.)



CERTIFICATE OF REPORTER

I, Ashley C. Huelsmann, a Registered Professional Reporter and Certified Shorthand Reporter (IL) do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me pursuant to 5 ILCS 255/2 (from Ch. 101, par.2); that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.



Certified Shorthand Reporter
within and for the State of Illinois