# Exhibit 3

# CHAPTER 13

# LOST EARNINGS OF PERSONS*

**Daniel G. Lentz**

**Elizabeth B. Sandza**

## CONTENTS

13.1 Introduction

13.2 Information Needed for Analysis

(a) Data Specific to the Case

(b) Data from Reference Sources

13.3 Components of a Claim

(a) Earnings and Income Items

13.4 Mitigating Factors and Offsets

(a) Actual or Mitigating Earnings

(b) Personal Consumption Expenditures

(c) Taxes

13.5 Other Considerations

(a) Survival Action versus Wrongful Death Action

(b) Employee versus Self-Insured

(c) Lost Wages of Undocumented Workers

(d) Cases Involving Children

(e) Period of Loss

(f) Discounting Lost Earnings to Present Value

13.6 Conclusion

**NOTES**

**REFERENCES**

## 13.1 INTRODUCTION

In personal injury, wrongful termination, wrongful death, medical malpractice, and similar tort cases, the law allows the plaintiff compensation for economic loss when the court finds the defendant liable. The economic loss can include many types of loss that the plaintiff suffers, including medical bills, but the plaintiff's or decedent's lost earnings usually become the primary component of claimed economic damages. Lost earnings represent the monetary loss, in present-value dollars, stemming from the individual's inability to provide certain services or the ability to provide them only for reduced compensation.

## 13.2 INFORMATION NEEDED FOR ANALYSIS

Before preparing an analysis of lost earnings, the expert will need to obtain case-specific information and relevant statistical data from various reference sources.

### (a) Data Specific to the Case

Data specific to the case include personal data, employment and earnings data, and health data.

*(i) Personal Data* Making case-specific use of governmental statistical data requires the plaintiff's or decedent's personal information such as age, gender, race, and educational level. Practitioners use the date of birth to estimate the statistical dates of retirement and death from working-life and life expectancy tables. In wrongful death cases, the dates of birth and health conditions of all immediate family members and the decedent's marital status influence the estimation of the portion of the household income spent by the decedent on personal consumption. The date of injury or death establishes the beginning of the loss period.

*(ii) Employment and Earnings Data* The expert should obtain a complete employment history of the plaintiff or decedent as far back in time as the facts and circumstances of the case warrant. Many employers keep personnel files that contain records of all raises and promotions, as well as termination letters specifying severance pay and benefit options under the Consolidated Omnibus Budget Reconciliation Act (COBRA). Employee handbooks often contain statements of benefits and examples of how to compute pensions. These calculations are sometimes employee specific. Handbooks for companies with cafeteria benefit plans will show the options that employees have and the portion the employer paid. Employers sometimes have records showing the vested portion of the employee's pension plan, as well as information on any stock option plans or 401(k) plans. The expert should request that counsel subpoena employment records directly from the employers rather than rely on the plaintiff to produce relevant records.

When a party puts his or her income into issue in a lawsuit (e.g., by claiming lost wages) and the party seeking the tax returns has a legitimate interest in the information, many jurisdictions will allow the discovery of tax returns but will not necessarily allow the admission of such records into evidence at the trial. Other jurisdictions consider tax returns protected by privilege and will not allow such discovery.[1] If allowed the discovery of tax records, the expert can use them to form an opinion, even if the tax returns will not be admitted as evidence. The plaintiff or survivors can, however, *elect* to produce tax returns to support a claim for lost earnings based on income that employment records do not always document, such as income from self-employment. When the experts cannot obtain tax returns, reviewing W-2s, 1099s, and year-end pay stubs proves useful.

Whatever the source, the expert should obtain available data regarding the plaintiff's or decedent's salary, job titles, promotions, and benefits. When evaluating benefits and retirement plans, the expert will need to identify the differences in the benefit and retirement plans in the undamaged and damaged projection periods. In cases involving unionized employees, the expert needs to understand the benefits the union provided versus those the employer provided.

In wrongful death and survivor actions, the expert should collect employment and earnings information for other household members and plaintiffs in order to establish household income and evaluate dependency.

*(iii) Health Data* Although the financial experts do not assess the plaintiff's physical condition, they should have a reasonable foundation for an opinion on the plaintiff's ability to return to the same job in the future or to obtain alternative employment. In personal injury cases, the attorney usually retains a medical expert. If the plaintiff requires long-term care because of the injury, the attorney will often retain a rehabilitation or vocational expert. The expert should review any reports these other experts prepare and base any assumptions regarding physical ability to work on their testimony. The expert should also consider a medical expert's opinion regarding any physical impairment of the plaintiff prior to the harmful incident. If preexisting physical impairments will adversely affect the individual's earnings, the expert should adjust any damages calculation accordingly.

## (b) Data from Reference Sources

To calculate lost earnings, the expert must often estimate or project certain inputs. Government statistics can help in estimating the following inputs when the expert cannot obtain case-specific data. Experts should be mindful of *Daubert* standards (see Chapter 3) when using any general statistical data, as courts can challenge the relevance of such data if the statistics do not tie to the specific facts and circumstances of a particular case.

*(i) Work-Life Expectancy* The expert must estimate the plaintiff's or decedent's remaining working life had the incident not occurred. Unless the individual had extraordinary pre-incident family or health circumstances, one source of average working life is the 2011 article by Skoog, Ciecka, and Krueger, "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors."[2] This article contains work-life expectancies by age, gender, race, and education.

The calculations use the increment-decrement model first published by the Bureau of Labor Statistics (1986) in *Worklife Estimates: Effects of Race and Education*. These publications provide total time measured in years of remaining labor force participation, not years until final separation from the workforce.[3] Depending on the facts of the particular case, the expert should consider adjusting the work-life expectancy to reflect intermittent periods of unemployment. The expert should also consult any retained medical and vocational experts in injury cases to ascertain whether the plaintiff's health condition will adversely affect work-life or life expectancy.

*(ii) Life Expectancy* Analyzing lost pension and other retirement benefits such as Social Security requires an estimate of the plaintiff's or decedent's life expectancy. The National Center for Health Statistics lists life expectancies by age, gender, and race. In cases that evaluate lost household services, a publication entitled *Healthy Life Expectancy* provides an alternative measure of life expectancy that combines mortality and morbidity (health status) data.[4]

*(iii) Average Earnings* The expert will generally project but-for earnings based on the plaintiff's or decedent's specific work history and occupation or profession. In situations without case-specific data, the expert will have to rely on data regarding the average earnings of similarly situated individuals. The annual March supplement to the *Current Population Survey (CPS)* by the U.S. Census Department provides national average earnings data by age, gender, and education level. The Bureau of Labor Statistics publication *Occupational Employment Statistics (OES) Survey* lists annual earnings data by occupation for selected metropolitan areas. For certain occupations or in certain industries, private surveys provide more specific average salary information. Data from these various sources also help in projecting actual or mitigating earnings that the plaintiff could possibly earn in alternative employment.

## 13.3 COMPONENTS OF A CLAIM

Exhibit 13-1 shows the components of a claim that the practitioner must consider for each of the three types of claims: personal injury/medical malpractice, wrongful termination, and wrongful death.

| | Types of Cases | | |
|---|---|---|---|
| | **Personal Injury/Malpractice** | **Wrongful Termination** | **Wrongful Death*** |
| Components of Damages Claims | | | |
| Earnings, Income Items, and | | | |
| Other Lost Value Components | | | |
| Compensation | X | X | X |
| Fringe Benefits | X | X | X |
| Pensions | X | X | X |
| Social Security: Retirement or Disability Benefits | X | X | X |
| Personal Services** | X | X | X |
| Medical and Rehab Expenses | X | | |
| Other Out-of-Pocket | X | X | X |
| Hedonic Damages | X | X | X |
| Mitigating Factors and Offsets | | | |
| Actual/Mitigating Earnings | X | X | |
| Consumption Expenditures | X | X | X |
| Taxes | X | X | X |

* Damages flowing to the deceased's estate

** Provided by the injured or deceased before the harm.

**Exhibit 13-1. Components of Damages Claims in Lost Earnings Cases**

Exhibit 13-2- illustrates the basic model generally used in calculating loss of earnings damages. The individual's but-for (or *undamaged*) earnings are the earnings the individual would have earned in the absence of the incident (injury, termination, or death). Actual (or *damaged*) earnings are the individual's projected earnings, given the consequences of the incident.[5] The lost earnings or damages equal the present value of the difference between these two projections. The damages calculation includes both lost past earnings (i.e., past losses or damages) and the lost future earnings (i.e., future losses or damages).




*Note*: Other issues include lost pension benefits and tax effects (where applicable). Case law in some jurisdictions may not allow for the addition of interest to past losses.

**Exhibit 13-2. Lost Earnings Methodology in Personal Injury Case**

## (a) Earnings and Income Items

*(i) Compensation* To project the plaintiff's or decedent's earnings stream as if the harmful incident had not occurred, one must understand and compute the individual's base earnings at the time of the incident. The but-for earnings should include all categories of earnings that the incident interrupted or impaired, including the following:

- Salary;
- Incentive compensation such as commissions or bonuses;
- Fringe benefits during the period of employment;
- Deferred benefits such as pensions or stock options; and
- Any relevant perquisites such as company cars.

But-for earnings do not include passive income, such as income from securities or dividends, unless the incident affects that income in some way.[6]

In most cases, the individual's earnings history prior to the incident offers a good source for understanding base-year earnings and predicting future earnings. The expert should obtain as full an earnings history as the facts and circumstances of the particular litigation warrant.

Some individuals have an erratic earnings history; the expert will have to ascertain the reasons for the pattern and use a different method to project but-for earnings. In some occupations, periods of economic slowdown or economic recovery will distort patterns. For example, bonuses or sales commissions often fluctuate with general or company-specific market conditions. Similarly, in cases involving hourly workers, compensation can go up or down from year to year since many hourly employees do not have a guaranteed minimum number of hours (e.g., construction workers). The earnings pattern will then depend on the number of regular and overtime hours worked.[7] The expert can solve this problem by obtaining the earnings of peer workers at the company or in the industry and using the peer workers' earnings pattern as a proxy for the plaintiff's or the decedent's post-incident but-for earnings.[8]

An individual's work history can also exhibit variability owing to periods of not working for reasons other than the job market or economic conditions. The expert must ascertain whether the absences reflect personal lifestyle choices or preexisting health conditions. If the observed pattern will likely recur, the expert should adjust the earnings projection to reflect the individual's work habits or situation. However, withdrawal for childbirth or child-rearing reasons or temporary leaves of absence following an accident unrelated to the claim will less likely influence the individual's projected future workforce participation.

Contractual arrangements or observed post-incident pay increases at the plaintiff's or decedent's former employer often dictate the growth rate of the individual's earnings pattern, at least in the short term. One example of this occurs when a unionized worker suffers an earnings stream interruption.

*(ii) Growth Rates* If the plaintiff's or decedent's earnings follow a consistent pattern and testimony indicates that the individual intended to stay employed in the same profession or with the same employer, the expert can project but-for earnings, taking into account recent trends in the individual's earnings as a supporting factor for anticipated future earnings.[9] An individual's historical earnings growth, however, can reflect general wage inflation in the economy, merit increases, and promotions to higher levels of responsibility. Therefore, an expert needs to understand the individual's place in his or her employer's hierarchy to assess the likelihood of future promotions at the same pace. Without this understanding, one cannot appropriately use the individual's past earnings trend to project future but-for earnings.[10]

If the individual's own earnings history does not adequately predict future growth, the expert can consider projecting a life-cycle pattern of earnings based on accepted age, experience, and earnings profiles.[11] Evidence of an impending promotion forgone on account of the incident can affect either the assumed but-for base earnings level or subsequent growth rates, or both.

*(iii) Pension Benefits* In some cases, lost compensation—especially pension benefits—extends beyond the work-life expectancy or retirement date. Employer-sponsored pension plans usually fall into one of two categories: defined contribution or defined benefit.

Defined contribution plans generally do not require the expert to project the plan benefits to be received after retirement. The expert needs only to ascertain the employer's contribution rate as a percentage of pay and then add the computed but-for contributions to lost earnings in the years the employer would have contributed to the pension plan.[12] Employer contributions to this type of plan differ from additional salary only in that the employee excludes pension contributions from taxable income in the year received. Defined benefit plans require the expert to project the actual monthly pension annuity payable beginning at retirement. The typical formula for the annual defined pension benefit includes parameters for years of service, salary levels, and the retirement date. The expert then calculates the present value of the stream of annual pension benefits payable from retirement through life expectancy either with or without cost-of-living adjustments, as set forth in the particular pension plan guidelines.[13]

*(iv) Fringe Benefits* Lost compensation includes lost fringe benefits. The expert should obtain details of the actual benefits the individual was receiving prior to the incident and the benefits a plaintiff will receive subsequent to the incident, and then project lost fringe benefits. The expert should consider the replacement cost of lost benefits as well.

Calculating lost fringe benefits as a percentage of the plaintiff's or decedent's undamaged and damaged income is a common error. Although this approach has merit for benefits linked to salary (such as employer savings and retirement plan contributions), it may not be appropriate for other benefits. For example, the individual's health care coverage is most often a function of whether the plaintiff has employment, not the plaintiff's income level. Hence, although an individual holds a lower-paying position post-injury or post-termination, he or she will likely have health insurance benefits.

When no data are available or the individual was not working at the time of the injury, a government publication titled *Employee Benefits Study* provides standard fringe benefit rates by industry or occupation group.[14]

*(v) Social Security Retirement or Disability Benefits* Many cases must consider Social Security benefits either as lost but-for income or as mitigating income. In some jurisdictions, when the injury permanently impairs but does not eliminate a plaintiff's earnings capacity, the plaintiff can claim lost Social Security retirement benefits. The expert would base this claim on the reduced benefits derived from lower earnings, and thus lower Federal Insurance Contributions Act (FICA) taxes, prior to retirement.[15] This claim would be moot if the plaintiff's actual earning capacity still exceeded the income threshold to which the FICA tax applies. If the individual's savings in FICA tax payroll deductions on account of lower post-incident earnings until retirement exceed the difference in lifetime benefits after retirement, the individual would not have a net loss.

A permanently disabled plaintiff sometimes receives Social Security disability benefits. In some specific jurisdictions and types of cases, the expert deducts actual benefits when estimating damages. The expert should consult with the counsel who has retained the expert for legal guidance in this area.

The government has straightforward formulas for computing Social Security benefits, basing retirement, disability, and survivor benefits on the individual's annual earnings subject to FICA tax over a specific number of years prior to the date when the beneficiary begins to receive benefits. For a normal retirement, the calculation includes the individual's highest 35 years of income indexed by an adjustment factor.[16] For a permanently disabled individual, the calculation shortens the time period on a sliding scale based on age at the time of the injury. Inserting the average of the indexed earnings subject to FICA tax over the applicable period into the benefit formula for the year of disability, retirement, or death yields the individual's primary insurance amount (PIA). The individual's family status and age (for retirees) then determine the Social Security benefit payable. William M. Mercer, Inc., and CCH Incorporated both publish annual guides to Social Security[17] that explain the calculations in detail and give helpful examples. The Social Security Administration website (www.socialsecurity.gov) also provides excellent information.

*(vi) Personal Services* Damages often include a claim for lost household services formerly performed by the decedent or injured plaintiff. For household services characterized as basic chores, practitioners can value the lost services by estimating the cost for an outside person to perform the service. For example, in the case of a decedent, one can hire a gardener to perform the yard care the deceased would otherwise have performed.

Injured people typically provide services for themselves and others at a reduced level compared to what they once did. In some cases, however, because of the interruption in their employment, injured plaintiffs can increase their production of these services. If an injured plaintiff performs services that were otherwise paid for (day care, for example), then this becomes an element of mitigation. Similarly, the injured employee could relieve a spouse, who then earns an income not previously earned. This also would present an element of mitigation.

Experts cannot easily establish the value of certain types of household services, especially parental nurturing. Some studies, however, have attempted these valuations; the practitioner should consult them if the damages claim will include personal services.[18]

*(vii) Out-of-Pocket Costs* In personal injury or medical malpractice cases, claimed damages often include some or all of past and future medical expenses, rehabilitation services or equipment, special education costs (when injuries cause cognitive impairment in children), and loss of household services. When quantifying damages for future medical or rehabilitation expenses, the financial expert usually relies on the medical or rehabilitation expert's opinion on the types and current cost of the required treatments. An analysis of the medical components of the Consumer Price Index can then guide the analyst in projecting future treatment costs to be discounted to present value. Other categories of damages in wrongful death cases include funeral and burial costs. Quantifying damages for these categories usually requires a straightforward summation of past and projected future out-of-pocket expenditures. The plaintiff might also make a claim for lost or reduced pension-related benefits.

*(viii) Hedonic Damages* Plaintiffs increasingly seek *hedonic damages* in personal injury and wrongful death cases. Hedonic damages compensate for the plaintiff's loss of enjoyment of life, whether the plaintiff is the physically injured party or a survivor of the deceased. Hedonic damages can include such items as the loss of the ability to participate in sports or hobbies and the loss of consortium with a spouse. Whether a plaintiff can receive this category of damages varies by jurisdiction. Jurisdictions that allow hedonic damages often constrain the amount allowed. Experts who quantify damages for lost earnings frequently debate the appropriate methods for quantifying hedonic damages and whether an expert should even attempt such quantification.[19]

## 13.4 MITIGATING FACTORS AND OFFSETS

### (a) Actual or Mitigating Earnings

To project the plaintiff's actual or damaged post-incident income stream in a personal injury or wrongful termination claim, the expert must understand the plaintiff's circumstances following the incident. In most jurisdictions, plaintiffs claiming damages in these types of actions have a duty to mitigate, which requires them to take reasonable steps to minimize the damages they incur by finding alternative employment. In some situations, actual earnings will not appropriately measure mitigating earnings. Examples include a plaintiff who chooses not to return to work despite medical opinions that he or she can do so or a terminated employee who does not make a reasonable effort to obtain comparable or substantially similar employment.

If the plaintiff can return to work, even in alternative employment, the expert should project post-incident actual or mitigating earnings in the damages analysis. In personal injury or medical malpractice cases, the financial expert usually requires an outside assessment of the plaintiff's ability to return to productive employment. Medical, rehabilitation, and employment experts often assist in this evaluation. A medical expert could assess the likely time that the plaintiff can return to work. A vocational or rehabilitation expert often provides the financial expert with types of occupations the plaintiff could pursue, given the injury. An employment expert can estimate likely periods of unemployment while the plaintiff conducts a job search. The expert can consult government statistics and other data to evaluate the labor market.

The expert's role can include researching average earnings associated with the plaintiff's post-incident occupational prospects to assess future actual (or damaged) earnings.[20] Absent information on specific occupations that the plaintiff could still pursue, the expert can incorporate in the analysis average earnings data by age, gender, years of schooling, and race from the annual March supplement to the *Current Population Survey (CPS)* by the U.S. Census Bureau. Alternatively, one can identify sedentary occupations with appropriate worker characteristics and vocational preparation using the *Dictionary of Occupational Titles* published by the U.S. Department of Labor. The expert can then incorporate in the analysis earnings data based on these sedentary occupations.

The expert should consider the opportunities for advancement in post-incident employment. For example, earnings from the new employer could begin lower than with the previous employer but have greater advancement potential, especially if the plaintiff can acquire additional training or education. In particular, as with the projection of but-for earnings, the expert could consider a life-cycle pattern of earnings to project growth for the post-incident job, adjusted for fewer years of experience if the plaintiff's pre-incident work skills do not transfer to the new employment situation.[21]

Sometimes people move from employee status to self-employed status, taking a risk for the chance of higher return. Cases with such facts require care. Earnings from the higher-risk business will not always measure mitigation appropriately. Defendants will not share in the upside of a business venture and should not underwrite the downside through a lost earnings claim. Under these circumstances, an expert could consider measuring mitigation by the earnings a person might reasonably expect in a similar position as an employee.

Mitigation involves difficult issues. Ultimately, jurors and judges make the final decision as to whether the injured party has properly mitigated any claimed damages.

## (b) Personal Consumption Expenditures

In wrongful death cases, the expert should deduct the decedent's personal consumption expenditures from lost compensation. Theory suggests that the surviving plaintiffs should receive only the benefits they would have received from the decedent's earnings; this would not include amounts for the decedent's incremental personal consumption.[22]

Data on personal consumption expenditures usually come in the form of consumption percentages of the combined gross income of all family members. Family size and income bracket typically dictate the percentage. Exhibit 13-3 illustrates the basic model used in wrongful death cases. The figure shows personal consumption with step-function characteristics because as children reach the age of 18 and leave the home, the personal consumption of either parent generally increases as a percentage of family income. (The consumption function is not derived by dividing all household expenditures among family members. Items such as the family home and a portion of associated utilities, for example, need not change because of one fewer member living at home.)




*Note*: Other issues include lost pension benefits. Case law in some jurisdictions may not allow for the addition of interest to past losses.

**Exhibit 13-3. Net Lost Earnings Methodology in Wrongful Death Case**

Common practice uses standard percentages to estimate the decedent's incremental consumption, except in the case of high-income individuals or when data are available. Unfortunately, no standard, accepted source exists for these percentages.

In 1961, Earl Cheit published a pioneering study on personal consumption expenditures in *Injury and Recovery in the Course of Employment*.[23] Based on the results of a survey he performed, Cheit calculated percentages for the personal consumption of the family breadwinner, based on family size. Experts still frequently use Cheit's percentages, although they are dated and do not provide percentages for nonnuclear families, such as single-parent families. In addition, Cheit did not adjust consumption percentages for the income level of the family, a primary determinant of consumption.

More recently, Patton and Nelson published consumption percentages based on research using the Consumption Expenditures Surveys published by the U.S. Department of Labor. Their 2007 article contains tables with consumption percentages based on gender, total family income, and family size. They used a straightforward method that an expert can adjust in cases involving unique facts to recalculate a case-specific percentage.[24]

In cases that involve high-income decedents or merit the cost of a more detailed analysis, the expert can establish a case-specific consumption percentage based on the deceased's past spending patterns. Provided sufficient information exists on the household's spending habits, the expert can review all family expenditures over an appropriate period and classify them as either personal or joint family expenses. In this way, the expert can arrive at the decedent's personal consumption, adjusted accordingly over time as children become adults and leave the family unit.

In some circumstances, wrongful termination cases also have a personal consumption component. The computation of lost net earnings should include deductions for expenditures formerly incurred as a necessary part of work that are no longer required (e.g., transportation to and from work, licensing fees, costs of required continuing education, trade journals, uniforms, and added meal costs). Job-related out-of-pocket costs could similarly reduce net earnings from a replacement job.

### (c) Taxes

In 1980, the U.S. Supreme Court ruled in *Norfolk & Western Railway Co. v. Liepelt*[25] that courts should calculate compensation for lost earnings net of income taxes. The decision resulted from the insight that the plaintiff receives tax-free damages stemming from injuries in these types of actions, whereas the lost earnings that provide the basis of the award would have been taxed as regular income to the plaintiff. Therefore, excluding taxes from the analysis would produce a windfall to the injured plaintiff.

In contrast, the recipient must pay federal income taxes on the entirety of an award for lost earnings in employment-related lawsuits, including wrongful termination. For this reason, lost earnings calculations in these matters ignore income taxes.

Despite the Supreme Court's decision, a number of jurisdictions have decided against considering taxes because of an offsetting reverse tax effect. Although injured plaintiffs escape taxation on their lost earnings when the analysis excludes taxes, plaintiffs usually receive personal injury damages awards as a lump sum representing the present value of the lost earnings. The court generally expects the plaintiff to invest this lump sum in some risk-free financial instrument that earns interest. The plaintiff, however, often pays income taxes on the interest earned on the risk-free financial instrument.[26] Projecting lost income before tax increases the present value of the damages award, whereas ignoring the taxes that the plaintiff must pay on interest earnings decreases the plaintiff's post-investment cash flow (thereby jeopardizing the intended income stream to the plaintiff).

Because the two effects of considering taxes have opposing consequences, some argue that courts can ignore taxes altogether. However, the two effects need not offset each other. The reduction in damages awards caused by using after-tax earnings varies with the plaintiff's income levels both before and after the injury and the assumed real growth rate in the projected earnings. The increase in the damages award required to cover the taxes on the interest earnings varies with the time period of projected loss and the nominal discount rate used.

In deciding whether to consider income taxes in damages calculations for lost earnings owing to injury or death, the expert should understand the applicable law. If the law allows consideration of income taxes, one should first calculate both the but-for earnings and the projected actual earnings on an after-tax basis, taking into account the applicable tax brackets (assuming the award itself is not taxable). To avoid projections of plaintiff-specific allowable deductions, a reasonable approach uses average tax rates by income level, published by the Internal Revenue Service.[27] Second, the expert must adjust for the taxes the plaintiff will pay on the interest earnings projected from the damages award. One approach is to use municipal bond rates as a discount rate, since the federal government does not tax interest on municipal bonds. If the individual has relatively low net income, analysts should not use this approach, since investors in the highest tax brackets drive the demand for, and price of, municipal bonds, making them inefficient for those in lower tax brackets. Another approach models the investment account for the lump-sum damages award and adjusts the damages award upward by an amount required to pay the taxes on the interest income. In any event, the loss-of-earnings expert needs guidance as to the legality of an after-tax analysis in a particular jurisdiction. If the jurisdiction allows, the analysis should consider taxes in personal injury and wrongful death actions.

The difference in the tax treatment of compensatory and punitive damages in physical injury cases makes settlements of such disputes more attractive for plaintiffs. If the case goes to judgment, the plaintiff must include any punitive damages awarded in taxable income. On the other hand, if the plaintiff settles the dispute and drafts the settlement agreement to reflect only compensatory damages, the damages can escape taxation. Defendants will often cooperate with the wording of such settlement agreements to avoid the stigma of paying punitive damages.[28]

# 13.5 OTHER CONSIDERATIONS

## (a) Survival Action versus Wrongful Death Action

Wrongful death cases differ from other types of cases in that the plaintiffs usually are the decedent's survivors. Hence, the plaintiffs' economic loss differs from the decedent's lost earnings; it consists of the portion of the decedent's compensation that would have benefited the plaintiffs. The United States recognizes two different legal causes of action, the *wrongful death action* and the *survival action*, depending on the jurisdiction. These causes of action are different regarding theories of recovery, statues of limitations, the availability of punitive damages, and other elements of damages. The decedent's survivors bring a wrongful death action (the more common), claiming damages or their economic loss as a result of the death. A survival action, brought on behalf of the decedent's estate, changes the damages approach from measuring the loss to the survivors to measuring the loss to the estate.[29]

## (b) Employee versus Self-Insured

Experts often find the projection of income streams for the self-employed more difficult than for employees who work for others. Self-employed people can often move income between salary and business net income. They can also benefit from company expenses such as vehicles, travel and entertainment, insurance, or even placing family members on the payroll. When the company gains or loses value or the individual takes draws or loans, defining a self-employed person's earnings becomes even more complicated. Careful analysis also distinguishes between the self-employed person's earnings on equity (which continues after injury or death) and the earnings from labor services. In this situation, the expert could estimate the cost to pay a manager to do the work the owner was doing and use that as the basis of calculating lost earnings.

### (c) Lost Wages of Undocumented Workers

Cases of injured unauthorized workers in the American workforce present several questions as to how to measure their lost wage damages. Is different treatment provided when they have an employment claim against their employer, sustain a job-related injury, or have a personal injury claim against a third party? Should the proper measure of damages for any alleged lost wages or earning capacity be premised upon wages that might have been earned unlawfully in the United States or upon lost wages that could have been earned lawfully in the plaintiff's home country? The answer is that different states treat these claims differently.

Starting in 2002 with *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), the U.S. Supreme Court held that the National Labor Relations Board (NLRB) cannot award back pay to undocumented workers, as such relief is foreclosed by federal immigration law. While defendants attempted to argue that *Hoffman* was a complete bar to recovery of lost wages by an undocumented worker plaintiff, several federal and state courts held that under the Immigration Reform and Control Act of 1986 (IRCA), Congress could not take away rights that were otherwise allowable under federal or state law.[30] That decision left the entire analysis up to the individual states and, as usual, the states have adopted widely disparate views.

For example, in Kansas and Florida, a plaintiff's undocumented status precludes recovery of lost income based on projected earnings in the United States. Instead, claims must be based on what the worker could have earned in his or her home country.[31] In contrast, Texas and New York are among a minority of states that allow recovery of damages for lost U.S. earning capacity regardless of the claimant's citizenship or immigration status.[32] Likewise, a district court in Massachusetts held that an undocumented worker's status did not bar recovery for reduced U.S. earning capacity or lost U.S. wages in a personal injury action.[33]

The Supreme Court of New Hampshire adopted a modified approach in holding an employer "may be held liable for lost United States wages if that illegal alien could show that the defendant knew or should have known of his status, yet hired or continued to employ him nonetheless."[34] A Maryland Court of Appeals acknowledged that immigration status is relevant to a claim for lost wages; however, the court held that the type and amount of lost earnings depends on the jury determining the likelihood of whether the plaintiff will remain in the United States for the duration of the relevant time period.[35] In California, the question is resolved in wrongful discharge cases, but not in third-party injury cases. In the case of a wrongful discharge, California allows a wrongfully discharged employee to recover U.S. wages but only up until the time the employer discovered that the employee was not allowed to work in the United States.[36]

The cases that allow the litigants to present to the trier of fact the question of how long the plaintiff is likely to continue working in the United States without being deported also raise the many questions of a person's immigration status. This area of the law has become confusing in recent years. The categories of immigrant residents include permanent residents (green card holders), permanent residents based on marriage (must be verified every two years), and nonimmigrant visa holders (can be extended up to six or seven years and in some cases indefinitely). Some immigrants are caught in limbo: although they are currently undocumented, they are on quota waiting lists and may later qualify for lawful permanent residence. Unless the plaintiff's status is clear, experts should consult immigration attorneys to help determine a realistic future duration.

### (d) Cases Involving Children

Cases involving children as the harmed party present other difficulties, primarily that of projecting a but-for earnings stream, since the child has no established profession or earnings history and usually no significant education. To deal with these issues, an expert can use national average earnings by age, gender, and education level published in the annual March supplement to the *Current Population Survey (CPS)* by the U.S. Census Bureau. The data require an assumption regarding the child's educational attainment. Experts can estimate probabilities of the child reaching specific educational levels based on the parents' education level.

Cases involving an injury or death of a child must consider the beneficiary of the child's but-for earnings stream. Although neither the law nor economic analysis suggests that a parent would have received any benefits from the child's future employment, the parents can introduce evidence that they would have received such benefits. If permitted by law, the practitioner should evaluate potential damages in this instance net of the estimated costs of child-raising.[37]

Cases that involve babies concern either wrongful death or wrongful birth. In wrongful death cases, the plaintiffs seek damages based on the child's projected future earnings; however, in wrongful birth cases the plaintiff parents generally seek damages for the costs associated with raising a child. The law in many jurisdictions has not yet evolved on this point and inconsistently views children at times as a net financial asset and at other times as a net financial liability.

### (e) Period of Loss

The period of the loss is the length of the damages period. The expert decides on the method of projecting but-for and actual earnings and the period of the loss. Government statistics and other studies provide data on work-life expectancies; however, the expert should consider relevant facts in the particular case.[38]

The damages period will not necessarily extend over the plaintiff's or decedent's full statistical work-life expectancy. When establishing the damages period, the expert should consider items such as the individual's pre-incident health conditions, family circumstances, actual work history, financial incentives such as deferred compensation or early retirement incentives, general market conditions in the individual's industry, and any contracts that directly affect the individual's work-life expectancy. In addition, as Exhibit 13-2 shows, the expert must evaluate whether the damages period for an injured or terminated plaintiff will end prior to a projected work-life or retirement date because of a full recovery of the earnings stream. For example, if a plaintiff previously employed as a manual laborer returns to college as a result of being injured, one might reasonably expect that at a future date prior to retirement, the plaintiff's actual earnings will surpass the but-for earnings. In these circumstances, the injury provides the plaintiff with opportunities that would not have arisen but for the injury. In terms of economic loss, past damages still exist, but the plaintiff's retraining will mitigate future economic losses, and damages will end or begin to diminish when the two earnings streams cross.

Wrongful termination cases require special consideration in deciding the length of the damages period. The probability that a person will work at a *specific* job is less than the probability of the person working at *any* job. Since work-life expectancy tables consider all employment, one would expect a terminated employee's expectation of staying with a particular employer to be less than the full work-life expectancy.[39] Examining normal employee turnover can help answer the question of how long a person would have stayed with a particular employer but for the alleged wrongful termination. Additionally, wrongful termination cases often have a high likelihood of full earnings recovery prior to expected retirement because the plaintiff can seek and obtain work in the same occupation.

In wrongful death cases, the expert should also consider additional factors to properly assess the time period of the surviving plaintiffs' damages recovery. For example, in the case of the death of a single parent whose only child was 15 years old, the court can limit the loss period on a component of damages to three years, absent evidence that the child would have continued to receive some benefit from the parent's earnings after reaching age 18.

Hence, an analysis of the damages period in loss of earnings cases must assess whether (1) the individual's work-life expectancy yields the appropriate period of damages, or (2) the particular facts and circumstances of the matter warrant a damages period of a different length.

## (f) Discounting Lost Earnings to Present Value

The expert can prepare damages models for lost earnings in either nominal (i.e., observed or actual) terms or real (i.e., inflation-adjusted) terms.[40] A model prepared in inflation-adjusted terms does not require the expert to project inflation separately. Its disadvantages include the difficulty of explaining to a jury the concept of an inflation-adjusted model and the complexity of calculating taxes on inflation-adjusted numbers (when the case requires an after-tax approach). In such a situation, an expert who uses the plaintiff's or decedent's historical earnings growth rates to project future growth must adjust for the inflation that occurred during the historical period, particularly during periods of high or changing inflation.

Whether experts use nominal or real models, they must select appropriate growth and discount rates to apply to but-for and post-incident earnings. Certain jurisdictions restrict the expert's choices on this topic. Some states have adopted the *total offset* method, requiring experts to assume that the inflation rate and discount rate exactly offset each other.[41] Absent this restriction, the expert must apply a discount rate to but-for and actual earnings that reasonably assesses the risk associated with the individual's future but-for and actual earnings patterns. In addition, the model should maintain expected historical relations in the economy among inflation, overall wage growth, and interest rates.[42]

In projecting earnings, the expert should not treat the individual's future uncertain income stream as a certain one. Some occupations or professions have more inherent risk or higher turnover rates than others. In addition, components of income representing incentive compensation or stock options have more inherent risk than base salary. The computations can incorporate an adjustment for the appropriate risk level apart from the discount rate used to convert future amounts to present value.

Certain jurisdictions dictate that plaintiffs need not accept any risk when investing the lump-sum damages award. For this reason, courts commonly use interest rates on government bonds or annuity rates for triple-A-rated insurance companies as discount rates. Some experts also use municipal bond rates to account for the effect of taxes the plaintiff would otherwise pay on the interest received.[43]

In either case, the maturity of the financial instrument used to discount projected lost earnings should match the damages period in order to best approximate the interest the plaintiff will earn on the lump-sum award. Because one can expect the plaintiff to withdraw the award steadily over the damages period to replace lost earnings, the expert can incorporate more than one discount rate. For example, the expert can use data from instruments with different maturities to derive the term structure of interest rates and then use the implied rate for each period, computed separately. Alternatively, experts who decide to use one discount rate to simplify the analysis can consider a blended discount rate based on yields on securities with maturities up to the end of the damages period or a discount rate based on yields on securities that mature midperiod.

## 13.6 CONCLUSION

Calculating lost earnings in personal injury, wrongful termination, and wrongful death cases requires an assessment of an individual's undamaged compensation stream, damaged compensation stream, expenses incurred (for personal injury) or forgone (for wrongful death), tax implications, and the time period of the loss. The financial analyst then computes the present value of the difference in these two compensation streams. From these basic principles springs an array of complicating issues and puzzles, which have been detailed in this chapter.

## NOTES

* The coauthors acknowledge Keith Ugone and Randi Firus, who coauthored versions of this chapter that appeared in previous editions of the *Litigation Services Handbook*. This chapter retains much of their work.

1. Charles S. Stein, "The Qualified Privilege against Discovery of Federal Income Tax Returns," *Pittsburgh Tax Review* 5 (2008): 173.

2. Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger, "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," *Journal of Forensic Economics* 22, no. 2 (2011): 165–229.

3. The number of years of expected working life is equal to or less than years to ultimate retirement because people are often unemployed during some of the years toward retirement. If the expert assumes that the years of remaining working life run consecutively beginning from the date of incident, this effectively front-loads the losses to earlier years and overstates the calculated damages, because future amounts are stated in present value. For this reason, some experts project losses through the individual's ultimate retirement date instead of expected working life but adjust each year's amount by the ratio of remaining working life to time until retirement or another measure of labor force participation.

4. *Healthy Life Expectancy: 2011 Tables* (Shawnee Mission, KS: Expectancy Data, 2011).

5. As Exhibit 13-2 shows, the start of damaged earnings upon return to work in an alternative job often follows a period of unemployment. The return to work can occur before or after the trial date.

6. Experts should consider passive income when computing the appropriate tax rates for an after-tax analysis. See discussion of taxes in Section 13.4(c).

7. For example, in the construction industry, a worker's earnings can fall substantially during a recessionary period and then increase rapidly as the recession ends.

8. In such an analysis, it is necessary to compare the individual's past work history with that of the peer group and adjust the peer group's post-injury performance used to project the individual's future earnings to account for this relation.

9. Experts can do this using either least squares regression analysis or a simple average of the historical real (i.e., inflation-adjusted) increases in the plaintiff's earnings. They must ensure that some future event will not render a simple projection of past growth rates inappropriate.

10. For example, a diminished likelihood of future promotions relative to past promotions warrants adjusting projected growth rates downward compared with past observations.

11. Real life-cycle wage increases (in excess of inflation and overall productivity growth) can be derived from data on average full-time year-round earnings by age bracket reported from the *Current Population Survey (CPS)*, *Annual Demographic Survey*, March Supplement. The detailed personal income tables by education level are contained in Table PINC-04, available on the Joint BLS/U.S. Census Bureau website (https://www.census.gov). To project the individual's earnings in nominal terms, the real life-cycle or experience-based increases are then combined with cost-of-living adjustments and overall productivity growth.

12. In a defined contribution plan, the beneficiary bears the risk of market fluctuation; in many companies, employees themselves control the investment of their assets. For this reason, it is unnecessary to project interest on the annual employer contributions as an element of loss, because the plaintiff can replace the interest income through investment of these amounts in funds or other investment vehicles with similar risk.

13. This method of projection is termed the expected life approach. An alternative method, the probabilistic approach, instead multiplies the annual pension benefit by the probability of the individual surviving from the present date until each future age, through the theoretical maximum-life age, and then sums the products. The expected life approach is more frequently used by experts because it is easier to use and easier to explain. In all realistic situations, when the projected discount rate does not change much from year to year and the probability of remaining alive at the end of each year declines through time, the expected life approach will give a higher amount for a life-contingent payment stream than will the actuarially sound probabilistic approach.

14. U.S. Chamber of Commerce *Employee Benefits Study* (Washington, D.C.: U.S. Government Printing Office).

15. Social Security payroll taxes are collected by the government under the authority of the Federal Insurance Contributions Act (FICA). As of January 2017, Social Security taxes equaled 12.4 percent (6.2 percent paid by the employee, 6.2 percent paid by the employer) on earnings up to the taxable maximum ($118,500 per year). The Medicare portion of FICA is 2.9 percent of all earnings without limit.

16. The retirement benefit formula includes 35 years, regardless of whether the individual had 35 years of earnings.

17. See *Social Security and Medicare: A Professional's Reference* (Louisville, KY: William M. Mercer, Inc.); and Avram Sacks, *Social Security Explained* and *Social Security Benefits Including Medicare* (listed in the References).

18. See *The Dollar Value of a Day: 2010 Edition*, Expectancy Data (listed in the References).

19. This chapter does not discuss the concept or the calculation of hedonic damages. For discussions on quantifying hedonic damages, see *Economic/Hedonic Damages* by Michael Brookshire (listed in the References).

20. One source of market-equivalent average wages by geographic location is the yearly *National, State, and Metropolitan Area Wage Estimates, Occupational Employment Statistics (OES) Survey*, U.S. Department of Labor, Bureau of Labor Statistics. Several states also have employment development or labor departments that monitor and report data for regional job markets.

21. Life-cycle increases should be applied to actual or starting wages only. If median or mean earnings in the post-incident occupation are used to estimate the basis of the individual's expected post-incident earnings, the average already accounts for life-cycle increases.

22. Some jurisdictions that provide for survival causes of action, rather than wrongful death actions, do not allow deductions for personal consumption expenditures. In addition, some jurisdictions allow deductions only for personal needs without clarifying whether this restricts the deduction to necessities only.

23. Earl Cheit, "Measuring Economic Loss Due to Death and Disability," in *Injury and Recovery in the Course of Employment* (New York: John Wiley & Sons, 1961), pp. 76–82.

24. Robert Patton and David Nelson, "Patton-Nelson Personal Consumption Tables, 2005–2006," *Journal of Forensic Economics* 20, no. 3 (2007): 217–25. This biannual journal contains a great deal of material presenting various studies and critiques of tables, models, and lost earnings theories that are of use to any expert proposing to testify in this area.

25. *Norfolk & Western Railway Co. v. Liepelt*, 444 U.S. 490 (1980).

26. U.S. Treasury securities are taxed at the federal level but not at the state and local levels. The issuing jurisdictions do not tax state and municipal bonds.

27. Data on "Individual Tax Statistics" by state are available on the Internal Revenue Service website, U.S. Department of the Treasury, www.irs.gov/taxstats/index.html.

28. Excerpt taken from Chapter 18 (Tax Treatment of Damages Awards), Section 18.4(a)(ii) of this handbook.

29. This chapter does not discuss the differences in damages quantification in these types of actions. However, the expert must be aware of such differences when calculating damages. In general, the expert also should consult with the legal counsel retaining the expert for legal guidance when quantifying damages.

30. *Riveria v. NIBCO, Inc.*, 364 F.3d 1057, 1074 (9th Cir. 2004).

31. *Hernandez-Cortez v. Hernandez*, No. 01-1241-JTM, 2003 U.S. Dist. LEXIS 19780 (D. Kan. Nov. 4, 2003) and *Veliz v. Rental Service Corp. USA, Inc.*, 313 F.Supp.2d 1317 (M.D. Fla. 2003).

32. *Tyson Foods, Inc. v. Guzman*, 116 S.W.3d 233 (Tex. Ct. App. 2003) and *Public Administrator of Bronx County v. Equitable Life Assurance Society of the United States et al.*, 192 A.D.2d 325 (1993), 595 N.Y.S.2d 478.

33. *Barros v. E.W. Bliss Co.*, No. 91-12633-Z, 1993 U.S. Dist. LEXIS 4015 (D. Mass. Mar. 25, 1993).

34. *Rosa v. Partners in Progress, Inc.*, 868 A.2 994, 1002 (N.H. 2005).

35. *Ayala v. Lee*, 81 A.3d 584 (Md. 2013)

36. *Salas v. Sierra Chemical Co.*, (2014) Cal.App.4th 173 Cal.Rpts.3d 689.

37. See *Expenditures on Children by Families*, U.S. Department of Agriculture, published annually.

38. Expected work-life, as defined by the Bureau of Labor Statistics, is the remaining time, measured in years, that an individual is expected to be a labor force participant (either working or actively seeking work) before ultimate retirement. For simplification, some experts assume that these years run consecutively beginning from the date of incident, but in actuality, the remaining "years" of working life are expected to be spread over a longer time interval to ultimate retirement that includes some periods not in the labor force.

39. For a plaintiff or decedent previously employed by one employer for most of his or her career, the distinction between total remaining working life and remaining working life at the one employer is likely less significant.

40. Nominal dollars include the effects of inflation and deflation. Real dollars are inflation-adjusted dollars that remove the effect of inflation from the figures.

41. For a convenient listing of the legal guidelines of various states, see Chapter 12 of *Economic/Hedonic Damages* by Michael Brookshire. In addition, the expert should consult with the retaining counsel concerning legal restrictions on the calculation of damages in the relevant jurisdiction. Recent issues of the *Journal of Forensic Economics* have contained special sections assessing economic damages in personal injury and wrongful death litigation in various states.

42. The relationship among these variables is demonstrated and discussed in the "Economic Assumptions and Methods" section of the yearly *Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Disability Insurance Trust Funds*, Social Security Administration website, https://www.ssa.gov/OACT/TR/ (Actuarial Publications).

43. The expert should ask for legal guidance concerning which rules affect the selection of a discount rate in the relevant jurisdiction.

## REFERENCES


Boudreaux, Kenneth J. "A Further Adjustment Needed to Estimate Lost Earnings Capacity." *Monthly Labor Review* (October 1983): 30–31.

Brookshire, Michael L. *Economic/Hedonic Damages: The Practice Book for Plaintiff and Defense Attorneys*. Cincinnati: Anderson Publishing Company, 1990.

Cheit, Earl. "Measuring Economic Loss Due to Death and Disability." In *Injury and Recovery in the Course of Employment*. New York: John Wiley & Sons, 1961, pp. 76–82.

Davidson, Sidney, Clyde P. Stickney, and Roman L. Weil. *Financial Accounting: An Introduction to Concepts, Methods and Uses*. 2nd ed. Hinsdale, IL: Dryden Press, 1979.

Eck, James R., and Jeffrey L. Ungeren. *Structuring Settlements*. New York: McGraw-Hill, 1987.

Expectancy Data. *The Dollar Value of a Day: 2010 Edition*. Shawnee Mission, KS: Expectancy Data, 2010.

———. *Healthy Life Expectancy: 2006 Tables*. Shawnee Mission, KS: Expectancy Data, 2011.

National Center for Health Statistics. *United States Life Tables, 2002. National Vital Statistics Reports*, vol. 53, no. 6. Hyattsville, MD: National Center for Health Statistics, 2004 (annual).

Patton, Robert T., and David M. Nelson. "Estimating Personal Consumption Costs in Wrongful Death Cases." *Journal of Forensic Economics* 4 (1991): 233–40.

———. “Patton-Nelson Personal Consumption Tables, 2005–2006.” *Journal of Forensic Economics* 20, no. 3 (2007): 217–25.

Sacks, Avram. *Social Security Explained: 2004 Edition*. Riverwoods, IL: Human Resources Products, 2004.

Sacks, Avram, and Katherine Lerner. *Social Security Benefits Including Medicare: 2004 Edition*. Riverwoods, IL: Human Resources Products, 2004.

Skoog, Gary R., James E. Ciecka, and Kurt V. Krueger. “The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors.” *Journal of Forensic Economics* 22, no. 2 (2011): 165–229.

U.S. Chamber of Commerce. *Employee Benefits Study*. Washington, D.C.: U.S. Government Printing Office (annual).

U.S. Department of Agriculture, Center for Nutrition Policy and Promotion. *Expenditures on Children by Families*. Miscellaneous Publication No. 1528 (published annually).

U.S. Department of Labor, Bureau of Labor Statistics. *Occupational Employment Statistics (OES) Survey*. Washington, D.C.: U.S. Government Printing Office (annual).

———. *Worklife Estimates: Effects of Race and Education*. Bulletin 2254. Washington, D.C.: U.S. Government Printing Office, February 1986.

U.S. Department of Labor, Employment and Training Administration. *Dictionary of Occupational Titles*. 4th ed., vols. 1–2. Rev. ed. Washington, D.C.: U.S. Government Printing Office, 1991.

———. *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*. Washington, D.C.: U.S. Government Printing Office, 1993.

U.S. Department of the Treasury. “Individual Tax Statistics.” Internal Revenue Service website, https://www.irs.gov/taxstats/indtaxstats/index.html.

U.S. Social Security Administration. *Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Disability Insurance Trust Funds*. Washington, D.C.: U.S. Government Printing Office.

William M. Mercer, Inc. *Social Security and Medicare: A Professional’s Reference*. Louisville, KY: William M. Mercer, 2004.